UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2012 APR 16  AM 10: 55

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| CORRE OPPORTUNITIES FUND, LP, ZAZOVE ASSOCIATES LLC, DJD GROUP LLLP, FIRST DERIVATIVE TRADERS LP, and KEVAN A. FIGHT,<br><br>Plaintiffs,<br><br>v.<br><br>EMMIS COMMUNICATIONS CORPORATION, JEFFREY H. SMULYAN, PATRICK M. WALSH, J. SCOTT ENRIGHT, SUSAN B. BAYH, GARY L. KASEFF, RICHARD A. LEVENTHAL, PETER A. LUND, GREG A. NATHANSON, and LAWRENCE B. SORREL,<br><br>Defendants. | Case No.<br><br>**1:12-cv-0491 SEB -MJD** |

## COMPLAINT

Plaintiffs Corre Opportunities Fund, LP, Zazove Associates, LLC, DJD Group, LLLP, First Derivative Traders LP, and Kevan A. Fight ("Plaintiffs"), by and through their undersigned attorneys, allege upon knowledge as to themselves, and upon information and belief as to all other matters unless otherwise noted, as follows:

### Nature Of Action

1.      This is a civil action seeking declaratory and injunctive relief from multiple violations of federal securities and Indiana corporate laws.   Defendants committed these violations in an unprecedented scheme to fraudulently secure control of and eliminate all the rights and privileges of the preferred stock of Defendant Emmis Communications Corporation ("Emmis" or the "Company"), rendering the securities held by the minority stockholders worthless. Defendants Jeffrey H. Smulyan, the President, Chief Executive Officer, Chairman of

the Board and controlling shareholder of Emmis, Patrick M Walsh, Executive Vice President, Chief Operating Officer and Chief Financial Officer of Emmis, and J. Scott Enright, Executive Vice President, Secretary and General Counsel of Emmis, are the chief architects of this scheme. Defendants Susan B. Bayh, Gary L. Kaseff, Richard A. Leventhal, Peter A. Lund, Greg A. Nathanson, and Lawrence B. Sorrel are members of Emmis' Board of Directors who approved this scheme.

### Jurisdiction And Venue

2.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 78aa, 78j, 78m(d)(3), 78m(e), 78n(a), 78n(e), 78t, and 28 U.S.C. §§ 1331, 1367(a).

3.      Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391.

4.      Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201.

### The Parties

5.      Defendant Emmis Communications Corporation is a publicly-traded media company that, *inter alia*, owns and operates over twenty radio stations, including in New York, Los Angeles, Chicago, St. Louis, Indianapolis, Hungary, Slovakia, and Bulgaria, and publishes several city and regional magazines, including *Texas Monthly, Los Angeles, Atlanta, Indianapolis Monthly, Cincinnati, Orange Coast*, and *Country Sampler*. Emmis' Class A Common Stock is listed on NASDAQ under the ticker EMMS, and Emmis' Preferred Stock is listed on NASDAQ under the ticker EMMSP.

6.      Defendant Jeffrey H. Smulyan is the President, Chief Executive Officer, and Chairman of the Board of Directors of Emmis.  Mr. Smulyan owns 559,290 shares of Class A Common Stock, and all 4,722,684 shares of the Class B Common Stock.  Under Emmis' Articles

of Incorporation, only Mr. Smulyan can own Class B Common Stock. Because each share of Class B Common Stock carries ten votes, as compared to one vote for each share of Class A Common Stock, Mr. Smulyan controls over 64% of the vote of Emmis' common stock. Emmis is a "Controlled Company" as defined in the NASDAQ listing standards because more than 50% of its voting power is held by one individual, Mr. Smulyan.

7.    Defendant Patrick M. Walsh is the Executive Vice President, Chief Financial Officer and Chief Operating Officer of Emmis and a member of Emmis' Board of Directors.

8.    Defendant J. Scott Enright is the Executive Vice President, Secretary, and General Counsel of Emmis.

9.    Defendants Susan B. Bayh, Gary L. Kaseff, Richard A. Leventhal, Peter A. Lund, Greg A. Nathanson, and Lawrence B. Sorrel are members of the Board of Directors of Emmis.

10.    Plaintiff Corre Opportunities Fund, L.P. is a limited partnership organized under the laws of Delaware with its principal place of business at 1370 Avenue of the Americas, New York, NY 10019. Corre owns 180,750 shares of Emmis Preferred Stock.

11.    Plaintiff Zazove Associates, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 1001 Tahoe Boulevard, Incline Village, Nevada 89451. Zazove is an investment adviser that manages portfolios for 12 institutional accounts that collectively own 491,510 shares of Emmis Preferred Stock. The 12 accounts have assigned to Zazove their claims against Defendants.

12.    Plaintiff DJD Group LLLP is a limited liability limited partnership organized under the laws of Florida with its principal place of business at 4221 West Boy Scout Boulevard, Suite 1000, Tampa, Florida 33607. DJD owns 76,810 shares of Emmis Preferred Stock.

13.    Plaintiff First Derivative Traders LP is a limited partnership organized under the laws of Pennsylvania with its principal place of business at 1319 Rutland Lande, Wynnewood, PA 19096.  First Derivative owns 5,500 shares of Emmis Preferred Stock.

14.    Plaintiff Kevan A. Fight is a resident of Ohio who owns or controls 57,750 shares of Emmis Preferred Stock.

### Factual Background

15.    Emmis owns the eighth largest publicly traded radio portfolio in the United States based on total listeners.  The domestic radio portfolio is comprised of twenty stations covering leading markets including New York and Los Angeles.  In addition to its domestic radio portfolio, Emmis also owns a portfolio of regional magazines, international radio stations, and digital and interactive businesses.  For the fiscal year ended February 28, 2011, Emmis reported revenues of $251 million and operating cash flow excluding impairments of $36 million.  Total assets were $472 million.

16.    Emmis Chairman and Chief Executive Officer Jeffrey Smulyan, who is also Emmis' controlling shareholder, has attempted to take the Company private on two separate occasions:  in 2006 and most recently in 2010.

17.    Today, Emmis' common stock trades at less than $1.00 per share and is currently subject to delisting proceedings by NASDAQ as a result.  Without revealing specific plans, the Company has stated it intends to maintain its NASDAQ trading listing.

18.    Given the stock decline, Mr. Smulyan's personal holdings of Emmis' common stock are now worth less than $5 million, down from over $50 million only five years ago.  Moreover, Mr. Smulyan is personally indebted to the Company under a loan that had a balance of $1.1 million at February 28, 2011.

19.     Although the market value of Emmis' common stock has declined, an analysis prepared by BIA Capital Strategies, LLC in April 2010 showed the Company's total asset value to exceed $620 million.  Concurrently with the BIA valuation, Emmis' own financial advisor, Moelis & Company ("Moelis"), completed a valuation that similarly ascribed a potential value of $608.9 million to Emmis following a "take private" transaction.  Since these valuations in 2010, Emmis sold three underperforming stations for $149 million in the summer of 2011, further illustrating that Emmis' assets have substantial value to media buyers that would not only cover Emmis debt obligations of $240 million and preferred obligations of $58 million, but create additional substantial gains for current shareholders.  Mr. Smulyan confirmed this view on Emmis' value in a conference call on January 12, 2012 when he stated that "I have always agreed that the value of the stock price of this company doesn't come close to reflecting the value of the company."

20.     An additional key to this valuation disconnect is a very valuable off-balance-sheet asset of $110 million that Emmis holds from a put option on one of its Los Angeles radio stations, KMVN-FM, to Grupo Radio Centro, S.A.B. de CV ("GRC").  Under this agreement, GRC has the right to lease the station from Emmis for $7 million per year until April 2016, and to purchase the station on or before March 27, 2013 for $85.5 million.  If GRC does not exercise its right to purchase the station, Emmis has a put option to require GRC in the last year of the agreement to purchase the station for a $110 million cash purchase price.  This substantial off-balance-sheet asset, when valued at the $85.5 million and $110 million purchase price amounts to 29% and 37%, respectively, of Emmis' total outstanding obligations ($240 million senior debt and $58 million in preferred obligations).

5

21.    Despite the poor performing Emmis stock price, Emmis executive compensation has not suffered.   For fiscal year-end February 28, 2012, Jeffrey H. Smulyan, the Chief Executive Officer and controlling shareholder, received $2,252,380 in cash compensation as part of a total compensation package of $2,801,472.   This compensation is up 32% versus Mr. Smulyan's 2011 compensation of $2,128,658, with 98% of that compensation in cash salary and bonus.   Patrick M. Walsh, as Chief Financial Officer and Chief Operating Officer, received $1,337,440 in cash compensation in 2012 as part of a total compensation package that totaled $1,706,639.   This equated to a compensation increase of 75% versus the prior year.   J. Scott Enright, the Secretary and General Counsel, received $1,008,317 in the latest annual period, a 100% increase over the prior year.   In the last two years alone, these three senior executives earned substantial increases in annual compensation with total compensation paid exceeding $9 million, the vast majority being paid in cash, and almost 60% directed to Mr. Smulyan.   Part of this compensation included a $1.7 million cash payment that the Board of Directors authorized in September 2011 for completing a sale of three underperforming radio stations.   As a reference point, the remaining outstanding preferred stock that Emmis has not repurchased, and that Mr. Smulyan and his senior management team are looking to render worthless, would be worth $14.6 million using the Company's December 2011 tender offering price of $15.56.

22.    When Mr. Smulyan founded Emmis in 1979, he secured voting control of Emmis's common stock, out of proportion to his economic stake, by establishing a dual class capital structure.   Mr. Smulyan designated himself as the sole owner of Class B Common Stock, entitled to ten votes per share, with holders of Class A Common Stock entitled to only one vote per share.   Thus, although there were 34,007,279 shares of Class A Common Stock and 4,722,684 shares of Class B Common Stock outstanding as of March 1, 2012, Mr. Smulyan

controls over 64% of the vote of Emmis's common stock. Mr. Smulyan remains the largest holder of Common Stock with 4,722,684 Shares of Class B Common Stock and 559,290 shares of Class A Common Stock, giving him the largest economic interest in the Common Stock, in addition to his voting control.

23.     In 1999, Emmis issued 2,875,000 shares of 6.25% Series A Cumulative Preferred Convertible Preferred Stock for $50 per share or approximately $144 million in aggregate proceeds. Under the terms of the governing Certificate of Designations (the "Certificate"), the Preferred Stock is entitled to certain rights, privileges and protections, including cumulative quarterly dividends at a rate of 6.25% annually. In the event the Company is not current with respect to the dividends, the Certificate prohibits the repurchase of securities ranking ratably or junior to the Preferred Stock (including the Common Stock), as well as the payment of dividends or other distributions to junior securities. In addition, the Certificate requires Emmis to repurchase the Preferred Stock at a price equal to $50 per share, plus accrued and unpaid dividends, in the event Mr. Smulyan takes the Company private (the "Take Private Put Right").

24.     Emmis has not paid a dividend on the Preferred Stock since October 2008. According to Emmis' Form 10-Q filed on October 12, 2011, the dividends in arrears totaled $26.1 million. Therefore, by the terms of the Certificate, Emmis is not permitted to repurchase any securities ranking junior or ratably with the Preferred Stock, or make any dividend or distribution on the Common Stock, until is it current with respect to the dividends on the Preferred Stock. Prior to the commencement of Defendants' fraudulent scheme described below, the aggregate value of the Preferred Stock's Take Private Put Right, an amount that must be financed and paid in connection with a "take private" transaction, was approximately $170 million.

**Mr. Smulyan's Failed Initial Attempts To Take Emmis Private**

25.     On May 25, 2010, Emmis announced that it had entered into a definitive merger agreement with JS Acquisition, LLC, an entity wholly-owned by Smulyan, which would result in Emmis being taken private.  This was Smulyan's second attempt to buy the Company after a failed takeover effort in 2006.  An analysis prepared in April 2010 by Emmis' financial advisor, Moelis, showed that, if the Company were taken private, Mr. Smulyan over only a two-year period could reap $38.6 million for a total return of 429% on his existing $9 million equity stake at the time.  This exceptional return was predicated on the Preferred Stock voting to amend the rights and privileges of their securities and exchange the securities at a significant discount to what they were contractually owed.  If Mr. Smulyan had structured the "take private" transaction to pay the Preferred Stock what it was contractually owed, the economics of the transaction would have been less compelling, but still lucrative for Mr. Smulyan.  To be clear, Mr. Smulyan was not investing new capital in the transaction, but instead rolling his common equity stake into the private company.

26.     Key to Mr. Smulyan achieving his exceptional 429% return through the take private was eliminating the Take Private Put Right.  To further this goal, Emmis filed a combined tender offer statement and proxy statement to solicit the Preferred Stockholders' vote. Pursuant to the tender offer statement, initially filed on May 27, 2010, Mr. Smulyan caused Emmis to ask Preferred Stockholders to vote to amend the Certificate to eliminate the Take Private Put Right.  In lieu of receiving the contractually required payment (approximately $55.25 per share at that time), Preferred Stockholders were asked to exchange their shares for subordinated debt instruments at a rate of $30 principal amount for each $50 liquidation preference of each share of Preferred Stock.  This represented a significant discount in both the

8

amount and form of payment compared to the Take Private Put Right. At the same time, despite the fact Emmis was not current with respect to dividends on the Preferred Stock, holders of Common Stock were being offered cash of $2.40 per share, representing roughly a 10% premium to the then current trading price.

27.     Success of the tender offer required an amendment to the Certificate governing the Preferred Stock, which by its terms required the affirmative vote of holders of two-thirds of the outstanding issue.   Two-thirds of the holders did not vote in favor of the proposed amendment, the tender offer failed, and Mr. Smulyan was unable to take Emmis private.

**Defendants' Undisclosed Scheme To Create "Zombie Shares"**
**To Deprive Minority Preferred Stockholders Of Their Rights**

28.     Frustrated by his inability to take Emmis private in 2010, Smulyan hatched a brazen scheme in 2011 to eliminate all the rights and privileges of the Preferred Stock, most notably the right to accrued and future dividends and the Take Private Put Right, by attempting to gain voting control of the Preferred Stock through sham derivative and related party transactions and voting to eliminate the rights and preferences contained in the Certificate. Elimination of these rights and preferences would render the Preferred Stock essentially worthless and pave the way for Mr. Smulyan to "take Emmis private" at a time of his choosing. At the outset of this scheme, Smulyan's objections were neither clear to holders of the Preferred Stock nor was any disclosure provided as to his intent.  It was only after each element of this scheme was in place that it became clear to holders what the underlying purpose was, causing Floyd Norris, a leading financial journalist with *The New York Times*, to comment in his March 29, 2012 "High & Low Finance" column that Mr. Smulyan had devised "a voting arrangement that the old Chicago Democratic machine would have found all too familiar."

29.     Without filing any proxy solicitation or tender offer statement, Mr. Smulyan caused Emmis to embark on a Preferred Stock shopping spree with the goal of placing at least two-thirds of the voting power of the Preferred Stock under his control, so he could cause Emmis to unilaterally "vote" out of existence the valuable rights and privileges of the remaining Preferred Stockholders.

30.     Beginning no later than October 2011, Emmis representatives privately approached a number of Preferred Stockholders and confronted them with what Emmis's Chief Financial Officer and Chief Operating Officer, Patrick M. Walsh, described as a "prisoner's dilemma."    Emmis proposed to repurchase holders' shares of Preferred Stock at a price determined by Emmis, approximately $15 per share.  The repurchases would divest the sellers of any economic or beneficial interest in their Preferred Stock, and Emmis treated the repurchased shares as retired for accounting purposes, booking a gain on extinguishment of the repurchased Preferred Stock of $55.8 million.  Generally, a company cannot vote shares it repurchases, but Emmis had devised a method to achieve what was economically a repurchase and yet "keep the vote alive."  The repurchases would be structured as "total return swap" transactions whereby holders would receive cash for their shares in the amount of approximately $15 and enter into a voting agreement assigning their voting rights and irrevocable proxies to Emmis.  The result was the creation of what are essentially "zombie shares" that exist solely for controlling the vote of the Preferred Stock, but are otherwise retired and extinguished as far as Emmis is concerned and provide no ongoing economic benefit to the seller.  Plaintiffs contend that these "zombie shares" cannot be treated as "outstanding" for voting purposes under the Certificate and governing law; however, Mr. Smulyan and Emmis contend that this device will succeed and are using it to coerce the plaintiffs to sell their shares back at a discount.

31.    In the private discussions with various Preferred Stockholders that commenced no later than October 2011, Emmis's representatives indicated that the Company would enter into these "total return swap" transactions with two-thirds of the outstanding Preferred Stock. Holders who did not agree to sell at the Company's predetermined price ran the risk that the other "prisoners" would agree to the deal. Emmis would then purport to exercise the voting rights of the "zombie shares" to amend the Certificate and eliminate the rights and privileges of the Preferred Stock, rendering the remaining "living" shares held by minority shareholders virtually worthless in the absence of an expensive litigation challenge. Emmis representatives told Preferred Stockholders with whom they chose to speak that Emmis had obtained financing from an undisclosed source to complete this transaction.  Essentially, the terms were not negotiable, and the Preferred Stockholders whom Emmis approached were given a short period of time to decide. To underscore the "prisoner's dilemma" and pressure Preferred Stockholders into selling their securities, Emmis represented to Preferred Stockholders that various other Preferred Stockholders had already sold their shares back to Emmis through the "total return swap" transactions and that they had better sell their shares back too "before it was too late and all the cash was gone."

32.    Emmis and its officers disclosed to a lender, in connection with a bank debt amendment signed November 11, 2011, its true purpose for acquiring the Preferred Stock, but withheld public disclosure of this intention, until after Emmis's "total return swap" transactions were accomplished.

33.    On November 14, 2011, Emmis filed a Form 8-K stating that it had entered into a Note Purchase Agreement with Zell Credit Opportunities Master Fund, L.P. ("Zell"), under which Zell agreed to purchase up to $35 million in unsecured notes from Emmis, the interest on

which would accrue at an annual rate of 22.95%, and the proceeds of which Emmis would use

enter into agreements to acquire Preferred Stock (the "Zell Financing"). The Form 8-K further

stated that Emmis had already "entered into securities purchase agreements with certain holders

of its Preferred Stock" under which "Emmis will purchase shares of its Preferred Stock from

such holders at prices that are below today's closing price," and that "[t]he transactions will

settle pursuant to the terms of total return swaps or escrow arrangements, the terms of which

provide that until final settlement of these arrangements, the seller agrees to vote its shares in

accordance with the prior written instructions of Emmis." Importantly, the $35 million Zell

Financing, which allowed the Company to borrow on the facility in four draws until February

2012, was also designed by Emmis to only add to the prisoner's dilemma. It did so by enabling

management to emphasize to preferred holders the limited pool of funds to take out the $170

million outstanding in outstanding preferred and that the $15 price for the preferred take-out was

non-negotiable. It also prohibited Emmis from paying already-accrued dividends to Preferred

Stockholders. The threat was starting to become clearer: the terms were take it or leave it, time

was running out, and there were a limited number of life boats for Preferred Stockholders.

 34. The following day, on November 15, 2011, Emmis filed a Form 8-K stating that it

had purchased 645,504 shares of Preferred Stock, or approximately 23% of the total outstanding

shares of Preferred Stock, that "[m]ost of these shares were purchased pursuant to the terms of

total return swaps," and that "these sellers have also entered into agreements to vote their shares

in accordance with the prior written instructions of Emmis." The Form 8-K further stated that

Emmis had drawn $11.7 million of the $35 million available to it under the Zell Financing.

 35. On November 22, 2011 Emmis filed a Form 8-K stating that it had purchased an

additional 1,035,925 shares of Preferred Stock, that "[t]he transaction will settle pursuant to the

terms of a total swap, the terms of which provide that until final settlement of these arrangements, the seller agrees to vote its shares in accordance with the instructions of Emmis," and that "[f]ollowing the transaction, Emmis will have the right to direct the vote of approximately 56.8% of the outstanding Preferred Stock." The Form 8-K further stated that Emmis had drawn $28.5 million of the $35 million available to it under the Zell Financing.

36.     The "total return swap" agreements referred to in Emmis' Form 8-Ks filed on November 14, 15, and 22, 2011, were not attached to the Form 8-Ks. Instead, Emmis waited until December 2, 2011, to file copies of the agreements. The agreements require the selling Preferred Stockholders to relinquish to Emmis all economic benefits from the Preferred Stock and to vote the Preferred Stock in accordance with Emmis' prior written instructions and provide Emmis with an irrevocable five-year term proxy and power-of-attorney to vote the Preferred Stock in the name of one of Emmis's executive officers.

37.     Emmis's use of the "total return swaps" to acquire Preferred Stock is deceptive and manipulative. Although all of the economic and voting rights of the Preferred Stock subject to the "total return swaps" negotiated in October and November 2011 have been relinquished to the issuer, and although Emmis considers the Preferred Stock "extinguished" for accounting purposes (recording a gain on extinguishment of Preferred Stock of $55.8 million), Emmis has not retired for record voting purposes the Preferred Stock subject to the "total return swap" arrangements. Instead, Emmis asserts that the artifice of a "total return swap" transaction allows it to obtain all the benefits of owning the Preferred Stock during the five-year term of the arrangement, but avoid having to retire the Preferred stock until after the securities are formally transferred from Emmis' transfer agent to Emmis at the end of the term of the arrangement. By using the "total return swap" artifice, Emmis has fraudulently secured for itself the right to vote

13

shares of Preferred Stock that should instead properly be retired. The preferred stock is effectively alive only to vote for Emmis to eliminate the rights and value of the preferred shares held by remaining outstanding holders.

38.    At no time during its private solicitation of proxies and offers to acquire Preferred Stock through November 22, 2011 did Emmis or Mr. Smulyan file a proxy solicitation or tender offer statement or otherwise publicly disclose their plan to acquire the voting power of two-thirds of the Preferred Stock and attempt to eliminate the rights of non-tendering holders.

39.    Moreover, although the selling Preferred Stockholders in the "total return swap" transactions are required to provide Emmis with an irrevocable proxy and power-of-attorney to vote the "zombie stock" in the name of one of Emmis's executive officers, the Company insider who received these irrevocable proxies, Mr. Enright, did not file a Schedule 13D to report beneficial ownership in excess of 5% of the Preferred Stock, or plans, proposals, arrangements and understandings with respect to such shares. Furthermore, although Mr. Smulyan directs and controls how Mr. Enright votes the proxies for the shares, Mr. Smulyan has not made a Schedule 13D filing to report his beneficial ownership of such shares, or plans, proposals, arrangements and understandings with respect to such shares.

**Emmis Commences A Public Tender Offer To Retire**
**Preferred Stock While Concealing Its Intentions**

40.    By November 22, 2011, Emmis had completed "total return swap" transactions covering 56.8% of the Preferred Stock, creating a large cohort of "zombie stock" but falling short of the two-thirds threshold. Failing in this initial effort, Mr. Smulyan caused Emmis to take additional measures in furtherance of his scheme to eliminate the rights of Preferred Stockholders. On December 1, 2011, Emmis commenced a tender offer to purchase and retire

Preferred Stock outright.  In so doing, Emmis sought to increase the percentage voting power of its "zombie stock" to cross the critical two-thirds threshold.

41.     On November 30, 2011, Emmis issued a press release announcing a modified "Dutch auction" tender offer to purchase up to $6,000,000 in Preferred Stock at a price per share not less than $12.50 and not greater than $15.56, representing a purchase price between 20 cents and 26 cents on the dollar. A modified "Dutch auction" tender offer allows shareholders to indicate how many shares and at what price they wish to tender their shares within the listed range, and the issuer in turn to determine the lowest price per share that will enable it to purchase the desired number of shares based on the number of shares of Preferred Stock tendered and the prices specified by the tendering shareholders.   Emmis' tender offer was not for all of the remaining Preferred Stock outstanding, but only for $6,000,000 in value (14.8% to 18.4% of the outstanding Preferred Stock as stated in the tender offer document), which when divided by the high end of the tender offer range $15.56, eliminated just enough shares such that the shares Emmis controlled under "total return swaps" would represent 66.673% of the total outstanding.

42.     On December 1, 2011, Emmis filed a tender offer statement on Schedule TO-I for its modified "Dutch auction" tender offer and subsequently filed amendments to its Schedule TO-I on December 2, 2011, December 12, 2011, December 14, 2011, January 2, 2012, and January 5, 2012.  Mr. Enright signed the Schedule TO-I filings on behalf of Emmis and personally certified that the information set forth in the Schedule TO-I filings was "true, complete and correct."

43.     Schedule TO-I for issuer tender offers has explicit "line item" disclosure requirements, such that an issuer must affirmatively disclose any intentions or plans that it has to

engage in one or more of an enumerated list of actions or transactions, including changing the rights of securities holders.

44. Emmis' Schedule TO-I filings failed to disclose Defendants' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders. Instead, in vague and misleading fashion, Emmis' Schedule TO-I filings merely stated that if it obtains voting control for two-thirds of the outstanding Preferred Stock it "may" elect to amend provisions applicable to the Preferred Stock. Emmis also failed to disclose that in the event this scheme did not work, shares it repurchased outright could be reissued with voting agreements to secure the two-thirds vote. Emmis would soon adopt this approach only a few weeks later.

45. On January 5, 2012, Emmis announced that it had acquired through the tender offer, and subsequently retired, 164,400 shares of Preferred Stock.

46. On January 12, 2012, Emmis held an earnings call. During the call, an investor noted the Company's recent purchases of Preferred Stock and specifically asked Mr. Smulyan what the "long-term plan" was in respect of such purchases. Mr. Smulyan did not disclose Emmis' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders. Instead, Mr. Smulyan falsely stated that he and the Company were merely "exploring our options."

47. On January 30, 2012, Emmis announced in a Form 8-K that it had entered into purchase agreements to acquire another 25,700 shares of Preferred Stock and that, after retiring these 25,700 shares, Emmis would have control of the voting for 61.3% of the remaining outstanding Preferred Stock. Emmis repurchased these shares at $21.50 per share, a 38% premium to the tender offer price, and noted the shares had been cancelled and retired.

**Emmis Issues "Self-Destructing" Preferred Stock**
**To A Trust Controlled By Mr. Smulyan**

48.     As a final step in their efforts to eradicate the Preferred Stock's value, Defendants dispensed with the hassle of finding additional sellers of Preferred Stock and decided instead to simply reissue Preferred Stock that Emmis had just repurchased to an entity at a nominal cost in exchange for voting control of the shares.

49.     In the January 30, 2012 Form 8-K in which it announced that it had entered into purchase agreements to acquire another 25,700 shares of Preferred Stock, Emmis also stated that it "may issue shares of Preferred Stock to a third party or third parties who may agree to vote their shares in accordance with the prior written instructions of Emmis" and that it would have voting control for over two-thirds of the outstanding Preferred Stock if it issued 390,304 shares under such voting arrangements.  (Had Emmis not made the purchase of 25,700 shares at $21.50 it would not have had enough shares to reissue the 390,304 shares.)  While Emmis hinted that it had a third-party "buyer" in mind, investors would have to wait more than six weeks to learn the identity of the supposed "third party" or "third parties."

50.     Like Emmis's Schedule TO-I filings, the Form 8-K that Emmis filed on January 30, 2012, failed to disclose Emmis's plan or intentions to eliminate the rights of the remaining Preferred Stockholders and instead stated, in vague and misleading fashion, that if Emmis obtained voting control for two-thirds of the outstanding Preferred Stock it "may" elect to amend the provisions applicable to the Preferred Stock.  Mr. Enright signed the Form 8-K filing on behalf of Emmis.

51.     On March 13, 2012, Mr. Smulyan caused Emmis to take further coercive action against the minority Preferred Stockholders that were unwilling to sell their shares back to Emmis at the distressed level of 26 cents on the dollar.  Emmis filed a Preliminary Proxy

Statement to announce a Special Meeting of shareholders at which holders of Class A Common Stock and holders of Class B Common Stock, voting as a single class, and holders of Preferred Stock would vote on proposed amendments to the Articles of Incorporation. The proposed amendments would strip all the rights and privileges of the Preferred Stock, including the right to accrued and unpaid dividends, the right to all future dividends, the right to a liquidation preference, and the Take Private Put Right. The Preliminary Proxy Statement alleged that Emmis had acquired the ability to vote two-thirds of the Preferred Stock through the voting agreements made as part of the "total return swaps" and a newly disclosed voting agreement with a "2012 Retention Plan Trust," newly created for the ostensible benefit of company employees, to which Emmis would issue 400,000 shares of Preferred Stock. The 2012 Retention Plan Trust was not a mere "third party." Rather, Mr. Smulyan was designated the Trustee of the 2012 Retention Plan Trust with authority to vote the Preferred Stock issued to the Trust.

52. Prior to the filing of the Preliminary Proxy Statement, no disclosure had been made with respect to the creation of the 2012 Retention Plan Trust or the issuance of 400,000 shares of Preferred Stock to the Trust. Unlike most incentive plans that offer common stock or cash to employees, the unusual currency of this plan was to be preferred stock issued to employees at a fraction of the value Emmis had paid to purchase these shares in its public tender offer only weeks before. It was only subsequent to the filing of the Preliminary Proxy Statement that Emmis then filed a Definitive Proxy Statement on March 21, 2012, announcing a meeting to be held on April 2, 2012 (separate from the meeting to which the Preliminary Proxy Statement referred) at which holders of Class A Common Stock and Class B Common Stock, voting together as a class, would meet to approve the 2012 Retention Plan Trust and the issuance of the 400,000 shares of Preferred Stock to the Trust.

53.     Because Mr. Smulyan controls the Common Stock's voting power through the super voting Class B, there was no risk shareholders would not approve the establishment of the 2012 Retention Plan Trust and the issuance of the shares.  As acknowledged in the Preliminary Proxy Statement, Emmis's control of both the "zombie shares" and the 2012 Retention Plan Trust gave the Company the two-thirds vote it needed to eliminate the rights and privileges of the Preferred Stock and render the shares worthless:   "The proposals to adopt the Proposed Amendments are expected to be approved by the holders of the Common Stock and Preferred Stock based on (i) the terms of total return swaps and voting agreements which Emmis entered into with certain holders of the Preferred Stock (including the Trustee of the 2012 Retention Plan Trust) and (ii) Mr. Jeffrey H. Smulyan's intention to vote his shares of Common Stock in favor of the proposals to adopt the Proposed Amendments."

54.     The issuance of Preferred Stock to the 2012 Retention Plan Trust is another example of Emmis's use of form over substance to achieve the Company's goal of securing the two-thirds vote of the Preferred Stock, amending the terms of the securities, and rendering the Preferred Stock worthless.  If the goal of the 2012 Retention Plan Trust was really employee retention, Emmis would not fund the trust with shares of Preferred Stock (which at present, clearly have value) and then cause the trustee (Mr. Smulyan) to vote to eliminate the rights and privileges of those shares, rendering them worthless.  Generally, retention plans are funded with common stock of the employer.  Emmis can unilaterally convert the Preferred Stock issued to the trust to common at any time.  No legitimate purpose existed for Emmis to go through the interim step of issuing Preferred Stock to the trust when Emmis has more than enough authorized common stock to fund the program.  The 2012 Retention Plan Trust was created solely to serve as a vehicle for Smulyan to vote shares of Preferred Stock and render the securities worthless.

55.     The Proposed Amendments for the sham "vote" that Defendants have engineered would:

a.     Remove Emmis' obligation to pay to holders of the Preferred Stock the amount of dividends in respect of their Preferred Stock that are accumulated on or prior to the effectiveness of the Proposed Amendments;

b.     Change the designation of the Preferred Stock from "Cumulative" to "Non-Cumulative" and change the terms such that dividends or distributions on the Preferred Stock will not accrue or be payable unless declared by the board of directors (and thereby eliminate the associated rights to elect directors in the event of dividend arrearages);

c.     Eliminate the restrictions on Emmis' ability to pay dividends or make distributions on, or repurchase, its Common Stock or other junior stock prior to paying accumulated dividends or distributions on the Preferred Stock;

d.     Remove the ability of the holders of the Preferred Stock to require Emmis to repurchase all of such holders' Preferred Stock upon certain going-private transactions;

e.     Remove the ability of the holders of the Preferred Stock to convert all of such Preferred Stock to Class A Common Stock upon a change of control at specified conversion prices;

f.     Provide that holders of the Preferred Stock will not vote as a separate class on a plan of merger, share exchange, sale of assets or similar transaction but will vote with the Common Stock on an as-converted basis (except as may otherwise be required by law); and

g.     Change the conversion price adjustment applicable to certain merger, reclassification and other transactions to provide that the Preferred Stock converts into the right to receive property that would have been receivable had such Preferred Stock been converted into Class A Common Stock immediately prior to such transaction.

56.     David Gale, an outside director on Emmis' Board of Directors, voted against the plan to issue 400,000 shares of Preferred Stock to an employee retention plan trust because "he believes that there is no economic reason for issuing shares of Preferred Stock to a trust under the 2012 Retention Plan other than to position Emmis to transfer wealth from the holders of the Preferred Stock to holders of the Common Stock," such as Mr. Smulyan.

57.     It is Mr. Smulyan, however, that controls Emmis, and Defendants are on the brink of a filing a Definitive Proxy Statement with respect to a Special Meeting to carry out their sham "vote" on the Proposed Amendments.

58.     Defendants deliberately waited until they believed that they had acquired voting control of two-thirds of what they deem to be the outstanding Preferred Stock to reveal the plan that they had devised long ago to acquire voting control of the Preferred Stock and unilaterally eliminate the valuable rights and privileges that the Preferred Stockholders acquired when they purchased their Preferred Stock.

59.     By repeatedly disregarding their disclosure obligations, Defendants threaten to stage a sham shareholder vote to deprive Preferred Stockholders of virtually all of their contractual rights and the value of their investments.  As minority holders of Preferred Stock, Plaintiffs are squarely in the crosshairs of Mr. Smulyan and Emmis, and will be irreparably harmed if this scheme is allowed to succeed.

60.     Absent injunctive relief, Defendants will no doubt prevail in their scheme to acquire voting control of two-thirds of the Preferred Stock through false, misleading, selective, and inadequate disclosures to investors and unilaterally "vote" out of existence the rights and privileges of the Preferred Stockholders, all without ever filing a proxy statement, tender offer statement or other disclosure statement with full disclosure of their plans and intentions until it was a *fait accompli*.  Once Plaintiffs and other Preferred Stockholders are eliminated from Emmis' capital structure, Defendants will have unfettered power to irrevocably alter the course of the Company through, for example, business transactions or combinations that they would not have been able to enter into had the rights and privileges of the Preferred Stockholders not been

eliminated, and it will be impossible to later restore the status quo or to adequately address the Preferred Stockholders' harm with money damages.

**COUNT I**
**(Violation of 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a-9)**

61.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

62.     This Count is brought against Defendants Emmis Communications Corporation, Jeffrey H. Smulyan, Patrick M. Walsh, and J. Scott Enright.

63.     Section 14(a) of the Securities Exchange Act of 1934, as amended ("the "Exchange Act"), 15 U.S.C. § 78n(a), and the rules and regulations promulgated thereunder, govern the solicitation of proxies. Pursuant to those statutory and regulatory provisions, proxies must not be solicited without proper compliance with the SEC's rules and regulations, including Regulation 14A. These statutory and regulatory provisions also provide that no solicitation of a proxy shall be made by any means which, *inter alia*, contain a statement that is false or misleading with respect to any material fact, or omits to state any material fact. Moreover, pursuant to 17 C.F.R. § 240.14a-9, no solicitation (not limited to proxy materials) may be made by means of any communication that is false or misleading, or that omits any material fact necessary to make the statements therein false or misleading.

64.     Section 14(a) of the Exchange Act, and rules and regulations promulgated thereunder, require full and fair disclosure in proxy solicitations and proper filing of proxy voting materials. It was enacted to prevent management and others from obtaining authorization for corporate action by means of inadequate or misleading disclosures.

65.     As discussed above, without filing any proxy solicitation statement, Emmis representatives, including Messrs. Smulyan, Walsh, and Enright, privately solicited Preferred

Stockholders to enter into "total return swap" transactions in which the Preferred Stockholders would be required to vote their Preferred Stock in accordance with Emmis' prior written instructions and provide Emmis with an irrevocable five-year term proxy and power-of-attorney to vote the Preferred Stock in the name of one of Emmis' executive officers.

66.     By ignoring the proxy rules and failing to file a proxy solicitation statement, Defendants failed to disclose material information, including all information that is required to be disclosed to investors in connection with a proxy solicitation pursuant to Section 14(a) and the rules promulgated thereunder, and illegally solicited and obtained the voting rights of Preferred Stockholders.

67.     By November 22, 2011, Emmis had accumulated 56.8% of the voting power of the Preferred Stock, or over 85% of the required votes for an amendment to the provisions of the Preferred Stock, without filing a proxy solicitation statement and without disclosing its plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

68.     Defendants' failure to file a proxy solicitation statement and disclose all information that is required to be disclosed to investors in connection with a proxy solicitation was at least negligent, if not reckless or deliberate, and is an essential link to Defendants' scheme to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

69.     Had Defendants filed the requisite proxy solicitation statement and fully disclosed to all of Emmis' investors at the outset their plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, Defendants would not have been able to coerce Preferred Stockholders to enter into "total return swap"

arrangements under which Preferred Stockholders relinquished to Emmis all of the economic benefits and voting rights of their Preferred Stock at a heavily discounted rate of under 26 cents on the dollar, would not have accumulated the voting power of the Preferred Stock that they have acquired, would not be in a position to strip, or even threaten to strip, Plaintiffs and the other remaining Preferred Stockholders of the rights and privileges accorded to their Preferred Stock, and would not be in a position to eliminate, or even threaten to eliminate, the value of the Preferred Stock of Plaintiffs and the other remaining Preferred Stockholders.

70.     Absent injunctive relief, Plaintiffs and other Preferred Stockholders will suffer irreparable harm because Defendants plan to adopt the Proposed Amendments to strip the Preferred Stockholders of all their rights and privileges in a rigged vote where irrevocable proxies were obtained through sham "total return swap" transactions and without the required disclosures for proxy solicitations. Because Mr. Smulyan controls the Common Stock and Emmis now controls over two-thirds of the vote of what it deems the outstanding Preferred Stock, the Common Stock and Preferred Stock votes in favor of the Proposed Amendments are a foregone conclusion.

71.     Defendants' failure to file a proxy solicitation statement and disclose all information that is required to be disclosed to investors in connection with a proxy solicitation violates Section 14(a) of the Exchange Act, Regulation 14A, and SEC Rule 14a-9.

72.     Plaintiffs are entitled to declaratory relief that Defendants violated Section 14(a) of the Exchange Act. Regulation 14A, and SEC Rule 14a-9 by soliciting, without any proxy solicitation statement, Preferred Stockholders to enter into "total return swap" transactions under which the Preferred Stockholders would be required to vote their Preferred Stock in accordance

with Emmis' prior written instructions and provide Emmis with an irrevocable proxy and power-of-attorney to vote the Preferred Stock in the name of one of Emmis' executive officers.

73.     Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock subject to the "total return swap" transactions that Defendants illegally solicited and obtained.

74.     Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained or offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock.

75.     Plaintiffs have no adequate remedy at law.

## COUNT II
### (Violation of 15 U.S.C. § 78m(e) and 17 C.F.R. §§ 240.13e-3, 240.13e-4, 240.13e-100, and 240.14d-100)

76.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

77.     This Count is brought against Defendant Emmis Communications Corporation.

78.     Section 13(e) of the Exchange Act, 15 U.S.C. § 78m(e), and the rules and regulations promulgated thereunder, govern the filings and disclosures required when an issuer makes tender offers for its own securities.  Under 17 C.F.R. §§ 240.13e-4 and 240.14d-100, an issuer is required to file certain documents with the SEC, make mandatory disclosures, including disclosures of the intended purpose and effect of its tender offer, and conduct any tender offer in accordance with the provisions of the Exchange Act.

79.     As discussed above, prior to December 1, 2011, without filing any tender offer statement, Emmis representatives, including Messrs. Smulyan, Walsh, and Enright, privately approached a substantial number of Preferred Stockholders and pressured them to sell their Preferred Stock, either directly or through "total return swap" transactions.

80.     By ignoring tender offer rules and failing to file a tender offer statement, Defendants failed to disclose material information, including all information that is required to be disclosed to investors in connection with a tender offer, and illegally offered to acquire and obtained beneficial ownership of Preferred Stock.

81.     By November 22, 2011, Emmis had accumulated 56.8% of the voting power of the Preferred Stock or over 85% of the required votes for an amendment to the provisions of the Preferred Stock, without filing a tender offer statement and without disclosing its plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

82.     Defendants' failure to file a tender offer statement and disclose all information that is required to be disclosed to investors in connection with a tender offer was at least negligent, if not reckless or deliberate, and is an essential link in Defendants' scheme to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

83.     Had Defendants filed the requisite tender offer statement and fully disclosed to all of Emmis' investors at the outset their plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, Defendants would not have been able to coerce Preferred Stockholders to sell their Preferred Stock, either directly or through "total return swap" transactions, at a heavily discounted rate of under 26 cents on the dollar, would not have accumulated the voting power of the Preferred Stock that they have acquired, would not be in a position to strip, or even threaten to strip, Plaintiffs and the other remaining Preferred Stockholders of the rights and privileges accorded to their Preferred Stock,

and would not be in a position to eliminate, or even threaten to eliminate, the value of the Preferred Stock of Plaintiffs and the other remaining Preferred Stockholders.

84.     Absent injunctive relief, Plaintiffs and other Preferred Stockholders will suffer irreparable harm because Defendants plan to adopt the Proposed Amendments to strip the Preferred Stockholders of all their rights and privileges in a rigged vote.  Because Mr. Smulyan controls the Common Stock and Emmis now controls over two-thirds of the vote of what it deems the outstanding Preferred Stock, the Common Stock and Preferred Stock votes in favor of the Proposed Amendments are a foregone conclusion.

85.     Defendants' failure to file a tender offer statement prior to December 1, 2011 and disclose all information that is required to be disclosed to investors in connection with a tender offer violates Section 13(e) of the Exchange Act and Exchange Act Rules 13e-4 and 14d-100.

86.     Plaintiffs are entitled to declaratory relief that Defendants violated Section 13(e) of the Exchange Act and Exchange Act Rules 13e-4 and 14d-100 by offering to acquire and obtaining, without any tender offer statement, Preferred Stock.

87.     Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that they illegally obtained through a tender offer without any tender offer statement.

88.     Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained or offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock.

89.     On December 1, 2011, Emmis filed a Schedule TO-I for its modified "Dutch auction" tender offer and subsequently filed amendments to its Schedule TO-I on December 2, 2011, December 12, 2011, December 14, 2011, January 2, 2012, and January 5, 2012.  Mr.

Enright signed the Schedule TO-I filings on behalf of Emmis and personally certified that the information set forth in the Schedule TO-I filings was "true, complete and correct."

90.     Schedule TO-I for tender offers has explicit "line item" disclosure requirements, such that an issuer must disclose any intentions or plans that it has to engage in one or more of an enumerated list of actions or transactions, including changing the rights of securities holders.

91.     Emmis' Schedule TO-I filings failed to disclose its plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.  Instead, in vague and misleading fashion, Emmis' Schedule TO-I filings stated that if it obtains voting control for two-thirds of the outstanding Preferred Stock it "may" elect to amend provisions applicable to the Preferred Stock.

92.     On January 5, 2012, Emmis announced that it had acquired through the tender offer, and subsequently retired, 164,400 shares of Preferred Stock.  By purchasing and retiring Preferred Stock, Emmis increased the percentage voting power of the outstanding Preferred Stock subject to its control under the "total return swap" arrangements.

93.     Defendants' failure to disclose all information that is required to be disclosed to investors in connection with its modified "Dutch auction" tender offer was at least negligent, if not reckless or deliberate, and is an essential link to Defendants' scheme to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

94.     Had Defendants' Schedule TO-I filings fully disclosed to all of Emmis' investors Defendants' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, Defendants would not have been able to acquire through the tender offer the shares of Preferred Stock that it did at the prices that it did,

28

would not have accumulated the voting power of the Preferred Stock that they have acquired, would not be in a position to strip, or even threaten to strip, Plaintiffs and the other remaining Preferred Stockholders of the rights and privileges accorded to their Preferred Stock, and would not be in a position to eliminate, or even threaten to eliminate, the value of the Preferred Stock of Plaintiffs and the other remaining Preferred Stockholders.

95.     Absent injunctive relief, Plaintiffs and other Preferred Stockholders will suffer irreparable harm because Defendants plan to adopt the Proposed Amendments to strip the Preferred Stockholders of all their rights and privileges in a rigged vote.  Because Mr. Smulyan controls the Common Stock and Emmis now controls over two-thirds of the vote of what it deems the outstanding Preferred Stock, the Common Stock and Preferred Stock votes in favor of the Proposed Amendments are a foregone conclusion.

96.     Defendants' failure to disclose in its Schedule TO-I filings all information that is required to be disclosed to investors in connection with a tender offer, including Defendants' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, violates Section 13(e) of the Exchange Act and Exchange Act Rules 13e-4 and 14d-100.

97.     Plaintiffs are entitled to declaratory relief that Defendants violated Section 13(e) of the Exchange Act and Exchange Act Rules 13e-4 and 14d-100 by offering to acquire and obtaining Preferred Stock based on false and misleading Schedule TO-I filings.

98.     Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that they illegally obtained through their modified "Dutch Auction" tender offer.

99.     Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained or offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock.

100.     As discussed above, Defendants have undertaken a series of transactions designed to acquire the voting power of two-thirds of what they deem to be the outstanding Preferred Stock and eliminate the rights and privileges of the remaining Preferred Stockholders.   If Defendants succeed in stripping the rights and privileges of the Preferred Stock, including the right to accrued and unpaid dividends, the right to all future dividends, the right to a liquidation preference, and the Take Private Put Right, the Preferred Stock will be virtually worthless and subject to delisting from NASDAQ.

101.     Under 17 C.F.R. §§ 240.13e-3 and 240.13e-100, an issuer must file certain documents with the SEC, including a Schedule 13E-3, and make mandatory disclosures in connection with any transaction or series of transactions that has either a reasonable likelihood or purpose of causing, either directly or indirectly, any class of equity securities of the issuer to be delisted from a national securities exchange.

102.     Emmis has failed to file a Schedule 13E-3 and make the required disclosures in violation of Section 13(e) of the Exchange Act and Exchange Act Rules 13e-3 and 13e-100.

103.     Plaintiffs are entitled to declaratory relief that Defendants violated Section 13(e) of the Exchange Act and Exchange Act Rules 13e-3 and 13e-100 by offering to acquire and obtaining, without any Schedule 13E-3 filing, Preferred Stock.

104.     Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that they illegally obtained without any Schedule 13E-3 filing.

105. Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained or offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock.

106. Plaintiffs have no adequate remedy at law.

## COUNT III
### (Violation of 15 U.S.C. § 78n(e) and 17 C.F.R. §§ 240.14e-1, 240.14e-3, and 240.14e-5)

107. Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

108. This Count is brought against Defendants Emmis Communications Corporation, Jeffrey H. Smulyan, Patrick M. Walsh, and J. Scott Enright.

109. Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and the rules and regulations promulgated thereunder, govern all tender offers and prohibit untrue statements of material fact and omissions in connection with tender offers. Moreover, 17 C.F.R. §§ 240.14e-1, 240.14e-3, 240.14e-4, and 240.14e-5, prohibit unlawful tender offer practices, tender offer transactions on the basis of material, nonpublic information, and purchases by covered persons outside of formal tender offers.

110. As discussed above, prior to December 1, 2011, without filing any tender offer statement, Emmis representatives, including Messrs. Smulyan, Walsh, and Enright, privately approached a substantial number of Preferred Stockholders and pressured them to sell their Preferred Stock, either directly or through "total return swap" transactions.

111. By ignoring tender offer rules and failing to file a tender offer statement, Defendants failed to disclose material information, including all information that is required to be disclosed to investors in connection with a tender offer, and illegally offered to acquire and obtained both economic and beneficial ownership over a majority of the Preferred Stock.

112. By November 22, 2011, Emmis had accumulated 56.8% of the voting power of the Preferred Stock, or over 85% of the required votes for an amendment to the provisions of the Preferred Stock, without filing a tender offer statement and without disclosing its plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

113. Defendants' failure to file a tender offer statement and disclose all information that is required to be disclosed to investors in connection with a tender offer was at least negligent, if not reckless or deliberate, and is an essential link to Defendants' scheme to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

114. Had Defendants filed the requisite tender offer statement and fully disclosed to all of Emmis' investors at the outset their plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, Defendants would not have been able to coerce Preferred Stockholders to sell their Preferred Stock, either directly or through "total return swap" transactions, at a heavily discounted rate of under 26 cents on the dollar, would not have accumulated the voting power of the Preferred Stock that they have acquired, would not be in a position to strip, or even threaten to strip, Plaintiffs and the other remaining Preferred Stockholders of the rights and privileges accorded to their Preferred Stock, and would not be in a position to eliminate, or even threaten to eliminate, the value of the Preferred Stock of Plaintiffs and the other remaining Preferred Stockholders.

115. Absent injunctive relief, Plaintiffs and other Preferred Stockholders will suffer irreparable harm because Defendants plan to adopt the Proposed Amendments to strip the Preferred Stockholders of all their rights and privileges in a rigged vote. Because Mr. Smulyan

controls the Common Stock and Emmis now controls over two-thirds of the vote of what it deems the outstanding Preferred Stock, the Common Stock and Preferred Stock votes in favor of the Proposed Amendments are a foregone conclusion.

116.    Defendants' failure to file a tender offer statement prior to December 1, 2011 and disclose all information that is required to be disclosed to investors in connection with a tender offer violates Section 14(e) of the Exchange Act and Exchange Act Rules 14e-1, 14e-3, 14e-4, and 14e-5.

117.    Plaintiffs are entitled to declaratory relief that Defendants violated Section 14(e) of the Exchange Act and Exchange Act Rules 14e-1, 14e-3, 14e-4, and 14e-5 by offering to acquire and obtaining, without any tender offer statement, Preferred Stock.

118.    Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that they illegally obtained through a tender offer without any tender offer statement.

119.    Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained or offer to rescind the transactions through which they illegally obtained Preferred Stock.

120.    On December 1, 2011, Emmis filed a Schedule TO-I for its modified "Dutch auction" tender offer and subsequently filed amendments to its Schedule TO-I on December 2, 2011, December 12, 2011, December 14, 2011, January 2, 2012, and January 5, 2012.  Mr. Enright signed the Schedule TO-I filings on behalf of Emmis and personally certified that the information set forth in the Schedule TO-I filings was "true, complete and correct."

121.   Schedule TO-I for tender offers has explicit "line item" disclosure requirements, such that an issuer must disclose any intentions or plans that it has to engage in one or more of an enumerated list of actions or transactions, including changing the rights of securities holders.

122.   Emmis' Schedule TO-I filings failed to disclose its plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.  Instead, in vague and misleading fashion, Emmis' Schedule TO-I filings stated that if it obtains voting control for two-thirds of the outstanding Preferred Stock it "may" elect to amend provisions applicable to the Preferred Stock.

123.   On January 5, 2012, Emmis announced that it had acquired through the tender offer, and subsequently retired, 164,400 shares of Preferred Stock.  By purchasing and retiring Preferred Stock, Emmis increased the percentage voting power of the outstanding Preferred Stock subject to its control under the "total return swap" arrangements.

124.   Defendants' failure to disclose all information that is required to be disclosed to investors in connection with its modified "Dutch auction" tender offer was at least negligent, if not reckless or deliberate, and is an essential link to Defendants' scheme to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

125.   Had Defendants' Schedule TO-I filings fully disclosed to all of Emmis' investors Defendants' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, Defendants would not have been able to acquire through the tender offer the shares of Preferred Stock that it did at the prices that it did, would not have accumulated the voting power of the Preferred Stock that they have acquired, would not be in a position to strip, or even threaten to strip, Plaintiffs and the other remaining

Preferred Stockholders of the rights and privileges accorded to their Preferred Stock, and would not be in a position to eliminate, or even threaten to eliminate, the value of the Preferred Stock of Plaintiffs and the other remaining Preferred Stockholders.

126.    Absent injunctive relief, Plaintiffs and other Preferred Stockholders will suffer irreparable harm because Defendants plan to adopt the Proposed Amendments to strip the Preferred Stockholders of all their rights and privileges in a rigged vote.  Because Mr. Smulyan controls the Common Stock and Emmis now controls over two-thirds of the vote of what it deems the outstanding Preferred Stock, the Common Stock and Preferred Stock votes in favor of the Proposed Amendments are a foregone conclusion.

127.    Defendants' failure to disclose in its Schedule TO-I filings all information that is required to be disclosed to investors in connection with a tender offer, including Defendants' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, violates Section 14(e) of the Exchange Act and Exchange Act Rules 14e-1, 14e-3, 14e-4, and 14e-5.

128.    Plaintiffs are entitled to declaratory relief that Defendants violated Section 14(e) of the Exchange Act and Exchange Act Rules 14e-1, 14e-3, 14e-4, and 14e-5 by offering to acquire and obtaining Preferred Stock based on false and misleading Schedule TO-I filings.

129.    Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that they illegally obtained through their modified "Dutch Auction" tender offer.

130.    Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained or offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock.

35

131.   Plaintiffs have no adequate remedy at law.

**COUNT IV**
**(Violation of 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5)**

132.   Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

133.   This Count is brought against Defendants Emmis Communications Corporation, Jeffrey H. Smulyan, Patrick M. Walsh, and J. Scott Enright.

134.   Section 10(b) of the Exchange Act, 15 U.S.C. § 78n(d), and 17 C.F.R. § 240.10b-5 make it unlawful to "employ any device, scheme, or artifice to defraud" or "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" in connection with the purchases or sales of securities.

135.   As discussed above, since at least October 2011 and potentially earlier, Defendants have planned to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

136.   Without disclosing in any public filing their plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, Defendants coerced Preferred Stockholders to sell their Preferred Stock, either directly or through "total return swap" transactions, through what Emmis' Chief Financial Officer and Chief Operating Officer, Patrick M. Walsh, described as a "prisoner's dilemma." Emmis representatives, including Messrs. Smulyan, Walsh, and Enright, privately approached certain Preferred Stockholders and told them that they had the choice of either selling their Preferred Stock to Emmis at a discounted rate or risk seeing the entire value of their securities eliminated by Emmis. The terms were not negotiable, and the Preferred Stockholders whom

36

Emmis approached were given a short period of time to decide. Moreover, the Emmis representatives emphasized that there was limited available financing and repurchases would be done on a "first come, first serve" basis. In this way, Defendants used selective disclosure of non-public information to coerce Preferred Stockholders to sell their Preferred Stock. By November 22, 2011, Emmis had accumulated 56.8% of the voting power of the Preferred Stock, or over 85% of the required votes for an amendment to the provisions of the Preferred Stock, through Defendants' fraudulent scheme.

137. On December 1, 2011, Emmis filed a Schedule TO-I for its modified "Dutch auction" tender offer and subsequently filed amendments to its Schedule TO-I on December 2, 2011, December 12, 2011, December 14, 2011, January 2, 2012, and January 5, 2012. Mr. Enright signed the Schedule TO-I filings on behalf of Emmis and personally certified that the information set forth in the Schedule TO-I filings was "true, complete and correct."

138. Emmis' Schedule TO-I filings failed to disclose its plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders. Instead, in false and misleading fashion, Emmis' Schedule TO-I filings stated that if it obtains voting control for two-thirds of the outstanding Preferred Stock it "may" elect to amend provisions applicable to the Preferred Stock.

139. On January 5, 2012, Emmis announced that it had acquired through the tender offer, and subsequently retired, 164,400 shares of Preferred Stock. By purchasing and retiring Preferred Stock, Emmis increased the percentage voting power of the outstanding Preferred Stock subject to its control under the "total return swap" arrangements.

140. On January 12, 2012, Emmis held an earnings call. During the call, an investor noted the Company's recent purchases of Preferred Stock and specifically asked Mr. Smulyan

what the "long-term plan" was. Mr. Smulyan did not disclose Emmis' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders. Instead, in false and misleading fashion, Mr. Smulyan stated that he and the Company were merely "exploring our options" without disclosing the Company's true plans and intentions in this regard.

141. On January 30, 2012, Emmis announced in a Form 8-K that it had entered into purchase agreements to acquire another 25,700 shares of Preferred Stock and that after retiring these 25,700 shares, Emmis would have control of the voting for 61.3% of the remaining outstanding Preferred Stock. The Form 8-K also stated that Emmis "may issue shares of Preferred Stock to a third party or third parties who may agree to vote their shares in accordance with the prior written instructions of Emmis" and that Emmis would have voting control for two-thirds of the outstanding Preferred Stock if it issued 390,304 shares under such voting arrangements. The Form 8-K failed to disclose Defendants' plan to eliminate the rights of the remaining Preferred Stockholders and instead stated, in vague and misleading fashion, that if Emmis obtained voting control for two-thirds of the outstanding Preferred Stock it "may" elect to amend the provisions applicable to the Preferred Stock. Mr. Enright signed the Form 8-K filing on behalf of Emmis.

142. As discussed above, Defendants have obtained voting control of two-thirds of what they deem to be outstanding Preferring Stock through a series of manipulative acts, and waited until March 13, 2012, when they had essentially already acquired voting control of two-thirds of what they deemed to be outstanding Preferred Stock, to finally reveal the plan they had devised long ago to acquire voting control of two-thirds of the Preferred Stock and unilaterally "vote" out of existence the valuable rights and privileges that the Preferred Stockholders

38

acquired when they purchased their Preferred Stock. For a period of at least five months (from at least October 2011 to March 13, 2012), therefore, Defendants solicited transactions and traded in Preferred Stock based on material, non-public information.

143. Had Defendants publicly disclosed to all of Emmis' investors at the outset their plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, Defendants would not have been able to coerce Preferred Stockholders to sell their Preferred Stock, either directly or through "total return swap" transactions, at a discounted rate, would not have accumulated the voting power of the Preferred Stock that they have acquired, would not be in a position to strip, or even threaten to strip, Plaintiffs and the other remaining Preferred Stockholders of the rights and privileges accorded to their Preferred Stock, and would not be in a position to eliminate, or even threaten to eliminate, the value of the Preferred Stock of Plaintiffs and the other remaining Preferred Stockholders.

144. Moreover, outside of Defendants, no investor who traded in Preferred Stock prior to March 13, 2012 was aware that Defendants planned to create a trust subject to Mr. Smulyan's control and issue shares of Preferred Stock to the trust so that they would have the ability to control the vote of over two-thirds of the Preferred Stock and unilaterally "vote" to eliminate the rights and privileges of the Preferred Stock.

145. Plaintiffs and other investors in Preferred Stock have been injured by, and are suffering ongoing injury as a result of, Defendants' fraudulent scheme to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders, and Defendants' manipulative acts and false statements and omissions of material fact in furtherance of such scheme.

146.    Absent injunctive relief, Plaintiffs and other Preferred Stockholders will suffer irreparable harm because Defendants plan to adopt the Proposed Amendments to strip the Preferred Stockholders of all their rights and privileges in a rigged vote.  Because Mr. Smulyan controls the Common Stock and Emmis now controls over two-thirds of the vote of what it deems the outstanding Preferred Stock, the Common Stock and Preferred Stock votes in favor of the Proposed Amendments are a foregone conclusion.

147.    Plaintiffs are entitled to declaratory relief that Defendants have violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 by failing to publicly disclose their plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders until they had already acquired the two-thirds voting power.

148.    Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock subject to the "total return swap" transactions that Defendants illegally obtained.

149.    Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained or offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock.

150.    Plaintiffs have no adequate remedy at law.

### COUNT V
### (Violation of 15 U.S.C. § 78m(d) and 17 C.F.R. §§ 240.13d-1 and 240.13d-101)

151.    Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

152.    This Count is brought against Defendants Jeffrey H. Smulyan and J. Scott Enright.

153.    Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and the rules and regulations promulgated thereunder, including 17 C.F.R. §§ 240.13d-1 and 240.13d-101, provide that any person, and any group acting together for the purpose of acquiring, holding, or voting securities of a company, who acquires, either directly or indirectly, the beneficial ownership of more than 5% of a class of securities registered under Section 12 of the Exchange Act must, within 10 days, file a statement on a Schedule 13D or amend an existing Schedule 13D.  A primary purpose of Section 13(d) is to alert and inform companies, their shareholders, and the investing public in general regarding share accumulations which could represent a potential shift in corporate control or a potential change in a company's direction and to compel full disclosure of information critical to shareholders in making informed decisions.

154.    A "beneficial owner" is any person who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has . . . [v]oting power which includes the power to vote, or to direct the voting of, such security," and includes any person who "directly or indirectly, creates or uses a . . . proxy, power of attorney . . . or any other contract, arrangement, or device with the purpose or effect of divesting [the record owner] of beneficial ownership of a security. . . as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act." 17 C.F.R. §§ 240.13d-3(a) and (b).

155.    Under 17 C.F.R. § 240.13d-101, a person who acquires, either directly or indirectly, the beneficial ownership of more than 5% of a class of securities must file a Schedule 13D to "describe any plans or proposals . . . which the reporting person may have which relate to or would result in (a) The acquisition by any person of additional securities of the issuer . . . (b) An extraordinary corporate transaction . . . (e) Any material change in the present capitalization or dividend policy of the issuer; (f) Any other material change in the issuer's business or

corporate structure . . . (h) Causing a class of securities of the issuer to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association; [or] (i) A class of equity securities of the issuer becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Act."

156.    Although the selling Preferred Stockholders in the "total return swap" transactions are required to provide Emmis with an irrevocable proxy and power-of-attorney to vote the Preferred Stock in the name of one of Emmis' executive officers, the Company insider who received these irrevocable proxies, Mr. Enright, did not file a Schedule 13D to report beneficial ownership in excess of 5% of the Preferred Stock, or plans, proposals, arrangements and understandings with respect to such shares, including, but not limited to, Defendants' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

157.    Furthermore, although Mr. Smulyan directs and controls how Mr. Enright votes the proxies for the shares subject to "total return swap" arrangements, Mr. Smulyan has not made a Schedule 13D filing to report his beneficial ownership of such shares, or plans, proposals, arrangements and understandings with respect to such shares.

158.    The failure to file the requisite Schedule 13D and disclose all information that is required to be disclosed to investors in Schedules 13D violates Section 13(d) of the Exchange Act and SEC Rules 13d-1 and 13d-101. The failure of Mr. Enright and Mr. Smulyan to file the requisite Schedule 13Ds deprived all investors of information necessary to ensure fair trading in Emmis Preferred Stock and will deprive Preferred Stockholders of a fair vote on the Proposed Amendments to the Company's Articles of Incorporation and the Certificate of Designation for the Preferred Stock.

159.     Absent injunctive relief, Plaintiffs and other Preferred Stockholders will suffer irreparable harm because Defendants plan to adopt the Proposed Amendments to strip the Preferred Stockholders of all their rights and privileges in a rigged vote. Because Mr. Smulyan controls the Common Stock and Emmis now controls over two-thirds of the vote of what it deems the outstanding Preferred Stock, the Common Stock and Preferred Stock votes in favor of the Proposed Amendments are a foregone conclusion.

160.     Plaintiffs are entitled to declaratory relief that Mr. Enright and Mr. Smulyan violated Section 13(d) of the Exchange Act and Exchange Act Rules 13d-1 and 13d-101 by failing to file a proper Schedule 13D and failing to disclose Defendants' purpose, plans, intentions, and agreements with respect to the Preferred Stock for which he holds irrevocable proxies, including, but not limited to, Defendants' plan to acquire the voting power of two-thirds of the Preferred Stock and eliminate the rights of the remaining Preferred Stockholders.

161.     Plaintiffs are entitled to injunctive relief preventing Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that they illegally obtained without making the proper disclosures on Schedule 13D.

162.     Plaintiffs are entitled to injunctive relief directing Defendants and their agents to divest the Preferred Stock that they illegally obtained, or offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock, without making the proper disclosures on Schedule 13D.

163.     Plaintiffs have no adequate remedy at law.

## COUNT VI
## (Violation of 15 U.S.C. § 78t(a))

164.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

165. This Count is brought against Defendants Jeffrey H. Smulyan, Patrick M. Walsh, J. Scott Enright, Susan B. Bayh, Gary L. Kaseff, Richard A. Leventhal, Peter A. Lund, Greg A. Nathanson, and Lawrence B. Sorrel.

166. Mr. Smulyan is the President, Chief Executive Officer, and Chairman of the Board of Directors of Emmis. Emmis is a "Controlled Company" as defined in the NASDAQ listing standards because more than 50% of its voting power is held by Mr. Smulyan.

167. Mr. Smulyan exercises control over the operations of Emmis, and the conduct of Messrs. Walsh and Mr. Enright as Emmis officers and employees. Mr. Smulyan had the power and ability to control or influence the particular acts of Emmis, Mr. Walsh, and Mr. Enright giving rise to violations of Sections 10(b), 13(d), 13(e), 14(a), and 14(e) of the Exchange Act.

168. Mr. Walsh is the Executive Vice President, Chief Operating Officer and Chief Financial Officer of Emmis and directly reports to Mr. Smulyan. Mr. Walsh exercises control over the operations of Emmis and had the power and ability to control or influence the particular acts of Emmis giving rise to violations of Sections 10(b), 13(e), 14(a), and 14(e) of the Exchange Act.

169. Mr. Enright is the Executive Vice President, Secretary, and General Counsel of Emmis and directly reports to Mr. Smulyan. Mr. Enright exercises control over the operations of Emmis and had the power and ability to control or influence the particular acts of Emmis giving rise to violations of Sections 10(b), 13(e), 14(a), and 14(e) of the Exchange Act.

170. Ms. Bayh, Mr. Kaseff, Mr. Leventhal, Mr. Lund, Mr. Nathanson, and Mr. Sorrel are members of the Board of Directors of Emmis, exercise control over the operations of Emmis and its management, including Messrs. Smulyan, Walsh, and Enright, and had the power and ability to control or influence the particular acts of Emmis, Mr. Smulyan, Mr. Walsh, and Mr.

Enright giving rise to violations of Sections 10(b), 13(d), 13(e), 14(a), and 14(e) of the Exchange Act.

171.    As controlling persons of primary violators of the Exchange Act, Mr. Smulyan, Mr. Walsh, Mr. Enright, Ms. Bayh, Mr. Kaseff, Mr. Leventhal, Mr. Lund, Mr. Nathanson, and Mr. Sorrel are liable under Section 20(a) of the Exchange Act, and Plaintiffs are entitled to declaratory, injunctive, and other appropriate relief that applies equally to the primary violators and their control persons.

172.    Plaintiffs have no adequate remedy at law.

**COUNT VII**
**(Violations of Indiana Law – "Total Return Swap"**
**Agreements and Related Voting Arrangements)**

173.    Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

174.    This Count is brought against Defendant Emmis Communications Corporation.

175.    Emmis coerced and intimidated the Preferred Stockholders with whom it chose to communicate into entering "total return swap" agreements and related voting arrangements.

176.    Under the "total return swap" agreements, the Preferred Stockholders relinquished to Emmis all incidents of beneficial ownership of the Preferred Stock they previously owned.

177.    Under the related voting arrangements, the Preferred Stockholders that entered the "total return swap" transactions relinquished to Emmis all rights to exercise discretion in voting the Preferred Stock.

178.    The shares of Preferred Stock that are subject to the "total return swap" agreements, to the extent they still exist, belong to Emmis.

45

179.   Emmis has conceded for public accounting purposes that the Preferred Stock subject to the "total return swap" agreements has been "extinguished," such that Emmis has recorded a gain on its acquisition of the Preferred Stock.

180.   Under Indiana law, the Preferred Stock that was acquired and extinguished by Emmis no longer can be legally voted, by anyone.

181.   Moreover, Indiana law does not permit a corporation to direct the vote of its own shares, except in the exercise of a *bona fide* exercise of fiduciary duty to a third party.

182.   Indiana law and policy do not permit an Indiana corporation to acquire beneficial ownership of its own capital stock while preserving the nominal exercise of voting rights by the selling stockholders.  More particularly, Indiana law and policy do not permit such a scheme when its purpose it to facilitate self-dealing and self-perpetuation by the corporation's management, to the detriment of stockholders.

183.   The "total return swap" agreements and related voting arrangements are unauthorized, illegal, and against the public policy of the State of Indiana.

184.   The "total return swap" agreements and related voting arrangements are unenforceable and void.

185.   The "total return swap" agreements and related voting arrangements were created and entered into by Emmis for the purpose of increasing the number of shares of Preferred Stock that Emmis would purport to control in connection with proposed amendments to the Emmis Articles of Incorporation that would strip all the rights and privileges of the remaining Preferred Stockholders, including the right to accrued and unpaid dividends, the right to all future dividends, the right to a liquidation preference, and the Take Private Put Right.

186. The "total return swap" agreements and related voting arrangements were and are a sham, device and artifice designed to strip all rights and privileges of any value to the Preferred Stockholders.

187. Plaintiffs are entitled to declaratory relief that the "total return swap" agreements and related voting arrangements violate Indiana law, and are void and unenforceable.

188. Plaintiffs are entitled to declaratory relief that the shares of Preferred Stock subject to the "total return swap" agreements were, as a matter of law and equity, owned by Emmis upon execution of those agreements, extinguished, and not outstanding or entitled to any vote.

189. Plaintiffs are entitled to injunctive relief preventing Emmis and its agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that was acquired by Emmis pursuant to the "total return swap" agreements.

## COUNT VIII
### (Violations of Emmis' Articles of Incorporation –
### Issuance of Preferred Stock to Emmis' "2012 Retention Plan Trust")

190. Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

191. This Count is brought against Defendant Emmis Communications Corporation.

192. The 2012 Retention Plan Trust was not created for a legitimate business purpose, but was instead created by Emmis for the purpose of increasing the number of shares of Preferred Stock that Emmis would purport to control in connection with proposed amendments to the Emmis Articles of Incorporation that would strip all the rights and privileges of the remaining Preferred Stockholders, including the right to accrued and unpaid dividends, the right to all future dividends, the right to a liquidation preference, and the Take Private Put Right.

193. The 2012 Retention Plan Trust was and is a sham, device and artifice designed to strip all rights and privileges of any value to the Preferred Stockholders.

194. Emmis' issuance of 400,000 shares of Preferred Stock to the 2012 Retention Plan Trust constitutes the issuance of a series of stock that will, in effect, rank senior to the Preferred Stock held by Plaintiffs, in terms of voting and other rights (the "New Preferred Stock").

195. Emmis' issuance of 400,000 shares of this New Preferred Stock to the 2012 Retention Plan Trust, so that it can purport to exert control over the vote of two-thirds of the Preferred Stock, constitutes the effective amendment of the Articles of Incorporation in a manner that will adversely affect the rights of holders of Preferred Stock in Emmis.

196. Section 7.3 of Exhibit A to the Amended Articles of Incorporation of Emmis states:

> The affirmative vote or consent of the holders of at least 66 2/3% of the outstanding Preferred Stock will be required for the issuance of any class or series of stock, or security convertible into the Corporation's stock, ranking senior to the Preferred Stock as to dividends, liquidation rights or voting rights and for amendments to the Corporation's Articles of Incorporation that would adversely affect the rights of holders of the Preferred Stock; provided, however, that any issuance of shares of preferred stock which rank ratably with the Preferred Stock (including the issuance of additional shares of the Preferred Stock) will not, by itself, be deemed to adversely affect the rights of the holders of the Preferred Stock. In all such cases, each share of Preferred Stock will be entitled to one vote.

197. Emmis' issuance of shares to the 2012 Retention Plan Trust, controlled by Mr. Smulyan, was not an issuance of shares with rights equivalent to those of the outstanding Preferred Stock. Rather, in conjunction with the shares beneficially owned by Mr. Smulyan under the "total return swap" agreements, Emmis was effectively issuing to Mr. Smulyan a class or series of shares providing direct control over a two-thirds majority of Preferred Stock, enabling him unilaterally to amend Emmis's Articles of Incorporation and "vote" out of

48

existence all the valuable rights and benefits of the holders of outstanding Preferred Stock. Such rights are senior to the rights held by the holders of the outstanding Preferred Stock.

198. Emmis was required by Section 7.3 of the Certificate to obtain the affirmative vote of at least 66 2/3% of the holders of the Preferred Stock before issuing the 400,000 shares of additional preferred stock to the 2012 Retention Plan Trust. The New Preferred Stock issued to the 2012 Retention Plan Trust is effectively Emmis common stock that Mr. Smulyan has attempted to disguise as preferred stock, with superior voting rights, designed to survive just long enough to win the required two-thirds vote.

199. The public market would value the New Preferred Stock, with the Call Option embedded by Emmis, such that, in economic terms, each share of the New Preferred Stock would have nearly nine times the voting power of every share of existing Preferred Stock. Under Section 7.3 of the Articles, "the affirmative vote or consent of the holders of at least 66 2/3% of the outstanding Preferred Stock will be required for the issuance of any class or series of stock, or security convertible into the Corporation's stock, ranking senior to the Preferred Stock as to dividends, liquidation rights, or voting rights...." Given the almost 9:1 effective voting right advantage for the New Preferred Stock issued to the 2012 Retention Plan Trust, the issuance of the New Preferred Stock by Emmis required a two-thirds vote by outstanding Preferred Stockholders.

200. Emmis did not seek or obtain such an affirmative vote.

201. The issuance of the 400,000 shares of preferred stock to the 2012 Retention Plan Trust was unauthorized, contrary to law, and void.

202. The 2012 Retention Plan Trust does not hold validly issued shares of Preferred Stock of Emmis, and cannot legally vote the shares that it purports to own.

203. Plaintiffs are entitled to declaratory relief that the issuance of 400,000 shares of Preferred Stock to the 2012 Retention Plan Trust violated Emmis' Articles of Incorporation and Indiana law, was unauthorized, and is void.

204. Plaintiffs are entitled to declaratory relief that the 400,000 shares of Preferred Stock purportedly issued to the 2012 Retention Plan Trust are not outstanding or entitled to any vote.

205. Plaintiffs are entitled to injunctive relief preventing Emmis and its agents from voting, directing others to vote, or taking any action on votes cast for, the 400,000 shares of Preferred Stock that was issued by Emmis to the 2012 Retention Plan Trust.

## COUNT IX
### (Violations of Indiana Law – Voting of Preferred Stock Purportedly Issued to Emmis' "2012 Retention Plan Trust")

206. Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

207. This Count is brought against Defendant Emmis Communications Corporation.

208. Indiana law prohibits subsidiary corporations from voting shares of the stock of a parent corporation, if the parent owns a majority of the subsidiary's shares.

209. The purpose and public policy for this prohibition is to ensure that the management and controlling shareholders of such a parent corporation do not abuse their authority to engage in self-perpetuating and self-dealing transactions that may be harmful to the corporation and its owners.

210. Indiana law provides a limited exception to this rule for instances where a corporation may need to direct the voting of a another entity for purposes of discharging a fiduciary duty, such as where the corporation is the general partner of a stockholding limited

partnership, or in the case of a *bona fide* employee benefit plan. In such instances, the beneficiaries of that fiduciary duty could act effectively to check the self-interest of the corporation's management and controlling shareholders.

211. This limited exception does not authorize or permit the establishment of a sham "employee benefit plan" that has not been established for the purpose of enhancing the welfare of corporate employees, but rather as an illegitimate tool for the corporation and its controlling shareholder to strip away rights and benefits guaranteed by the Articles of Incorporation to holders of Preferred Stock.

212. Even if Emmis were authorized to issue the 400,000 shares of purported Preferred Stock to the 2012 Retention Plan Trust, Emmis is not authorized or permitted by Indiana law to vote those shares.

213. Plaintiffs are entitled to declaratory relief that Emmis is not authorized or permitted by Indiana law to vote, or direct others to vote, or take any action on votes cast for, the 400,000 shares of Preferred Stock purportedly issued to the 2012 Retention Plan.

214. Plaintiffs are entitled to injunctive relief preventing Emmis and its agents from voting, directing others to vote, or taking any action on votes cast for, the 400,000 shares of Preferred Stock purportedly issued by Emmis to the 2012 Retention Plan.

## COUNT X
### (Breaches of Fiduciary Duties by Emmis Directors)

215. Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

216. This Count is brought against Defendants Jeffrey H. Smulyan, Patrick M. Walsh, Susan B. Bayh, Gary L. Kaseff, Richard A. Leventhal, Peter A. Lund, Greg A. Nathanson, and Lawrence B. Sorrel (collectively, the "Director Defendants").

217. Each of the individual directors of Emmis owes a fiduciary duty to the shareholders of the corporation, including the Preferred Stockholders, not to engage in conduct that is illegal, *ultra vires,* or fraudulent, or that otherwise is intended wrongfully to strip the Preferred Stockholders of their unique, established rights.

218. Each of the individual directors of Emmis owes a fiduciary duty to the shareholders of the corporation, including the Preferred Stockholders, not to participate in a fraudulent and deceptive scheme by the controlling shareholder to strip the existing rights of the holders of Preferred Stock, through amendments to the Articles of Incorporation and other conduct, for the personal gain of the controlling shareholder.

219. Each of the Director Defendants has breached these fiduciary duties by approving and authorizing the misconduct alleged herein.

220. These breaches of fiduciary duties have caused and threaten to cause severe harm to the Preferred Stockholders.

221. Plaintiffs are entitled to declaratory relief that the Director Defendants are in breach of their fiduciary duties to the Preferred Stockholders.

222. Plaintiffs are entitled to injunctive relief preventing the Director Defendants and their agents from continuing to engage in such breaches of fiduciary duties, including injunctive relief preventing the Director Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that Defendants illegally solicited or obtained and directing the Director Defendants to have Emmis divest the Preferred Stock that was illegally obtained or offer to rescind the transactions through which Preferred Stock or voting control over Preferred Stock was illegally obtained.

## COUNT XI
### (Breaches of Fiduciary Duties by Controlling Stockholder)

223. Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

224. This Count is brought against Defendant Jeffrey H. Smulyan.

225. Emmis is a "Controlled Company" as defined in the NASDAQ listing standards because more than 50% of its voting power is held by one individual, Mr. Smulyan. Mr. Smulyan controls the management of Emmis, and controls over 64% of the vote of Emmis Common Stock. Moreover, through the manipulative acts and false statements and omissions of material fact discussed above, Mr. Smulyan now effectively controls over two-thirds of the vote of what Emmis and Mr. Smulyan deem to be outstanding Preferred Stock. Even a person who managed to acquire all of the publicly available shares of Emmis could not defeat any proposal by Mr. Smulyan put to a vote of Emmis stockholders.

226. For purposes of defining the fiduciary duties Mr. Smulyan owes the Preferred Shareholders under Indiana law, Emmis should be treated as a closely-held corporation.

227. Mr. Smulyan, as Chairman, director and the controlling stockholder of Emmis, owes a fiduciary duty to the stockholders of the corporation, including the Preferred Stockholders, to deal openly, honestly and fairly with those stockholders.

228. Mr. Smulyan, as Chairman, director and the controlling stockholder of Emmis, owes a fiduciary duty to the stockholders of the corporation, including the Preferred Stockholders, not to be distracted from the performance of his official duties by his personal interests.

229. Mr. Smulyan has breached these fiduciary duties by proposing, approving and authorizing the misconduct alleged herein.

53

230.    These breaches have caused and threaten to cause severe harm to the Preferred Stockholders.

231.    Mr. Smulyan has a patent and substantial conflict of interest between his personal financial interests as controlling stockholder of Emmis and his fiduciary duties to the Preferred Stockholders.

232.    Mr. Smulyan cannot vote his own shares of common stock in Emmis, or direct others to vote shares of common stock or Preferred Stock in Emmis, on the subjects outlined in Emmis' March 13, 2012 Preliminary Proxy Statement, or on other matters affecting the rights of the Preferred Stockholders, without violating his fiduciary duties to the Preferred Stockholders.

233.    Plaintiffs are entitled to declaratory, injunctive, and other appropriate relief, including but not limited to, declaratory relief that Mr. Smulyan is in breach of his fiduciary duties to the Preferred Stockholders, injunctive relief preventing Mr. Smulyan and his agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock that Defendants illegally solicited or obtained, and injunctive relief directing Mr. Smulyan to have Emmis divest the Preferred Stock that was illegally obtained or offer to rescind the transactions through which Preferred Stock or voting control over Preferred Stock was illegally obtained.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment against Defendants as follows:

a)      declaring that the Defendants have violated Sections 10(b), 13(d), 13(e), 14(a), 14(e), and 20(a) of the Exchange Act and the rules and regulations promulgated thereunder;

b)      enjoining Defendants from any further violations of Sections 10(b), 13(d), 13(e), 14(a), 14(e), and 20(a) of the Exchange Act or the rules and regulations promulgated thereunder;

c)      enjoining the Special Meeting to vote on the Proposed Amendments set forth in the March 13, 2012 Preliminary Proxy Statement;

d)      enjoining the Defendants and their agents from voting, directing others to vote, or taking any action on votes cast for, Preferred Stock;

e)      invalidating any votes of Preferred Stock cast by Defendants or their agents or at the direction of Defendants or their agents;

f)      directing the Defendants and their agents to divest the Preferred Stock that they illegally obtained or to offer to rescind the transactions through which they illegally obtained Preferred Stock or control over the voting rights of Preferred Stock;

g)      declaring that the "total return swap" agreements and related voting arrangements violate Indiana law, and are void and unenforceable;

h)      declaring that the shares of Preferred Stock subject to the "total return swap" agreements were owned by Emmis upon execution of those agreements, extinguished, and not outstanding or entitled to any vote.

i)      declaring that the issuance of shares of Preferred Stock to the 2012 Retention Plan Trust violated Emmis' Articles of Incorporation and Indiana law, was unauthorized, and is void;

j)      declaring that the shares of Preferred Stock purportedly issued to the 2012 Retention Plan Trust are not outstanding or entitled to any vote;

k)      declaring that Defendants Jeffrey H. Smulyan, Patrick M. Walsh, Susan B. Bayh, Gary L. Kaseff, Richard A. Leventhal, Peter A. Lund, Greg A. Nathanson, and Lawrence B. Sorrel have breached their fiduciary duties to the Preferred Stockholders;

l)      enjoining Defendants Jeffrey H. Smulyan, Patrick M. Walsh, Susan B. Bayh, Gary L. Kaseff, Richard A. Leventhal, Peter A. Lund, Greg A. Nathanson, and Lawrence B. Sorrel from any further breaches of fiduciary duties to the Preferred Stockholders;

m)    awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' and experts' fees; and

n)    granting Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:  April 16, 2012          Respectfully submitted,

Wayne C. Turner
David C. Campbell
Michael R. Limrick
Patrick A. Ziepolt
BINGHAM GREENEBAUM DOLL LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN  46204-4900
(317) 635-8900
(317) 236-9907 (facsimile)
wturner@bgdlegal.com
dcampbell@bgdlegal.com
mlimrick@bgdlegal.com
pziepolt@bgdlegal.com

– and –

Adam H. Offenhartz (*pro hac vice pending*)
Aric H. Wu (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
(212) 351-4035 (facsimile)
aoffenhartz@gibsondunn.com
awu@gibsondunn.com

*Attorneys for Plaintiffs Corre Opportunities Fund,
LP, Zazove Associates LLC, DJD Group LLLP,
First Derivative Traders LP, and Kevan A. Fight*