UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CORRE OPPORTUNITIES FUND, LP, | ) | |
| ZAZOVE ASSOCIATES LLC, DJD | ) | |
| GROUP LLLP, FIRST DERIVATIVE | ) | |
| TRADERS LP, and KEVAN A. FIGHT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:12-cv-491-SEB-TAB |
| | ) | |
| EMMIS COMMUNICATIONS | ) | |
| CORPORATION, JEFFREY H. | ) | |
| SMULYAN, PATRICK M. WALSH, J. | ) | |
| SCOTT ENRIGHT, SUSAN B. BAYH, | ) | |
| GARY L. KASEFF, RICHARD A. | ) | |
| LEVENTHAL, PETER A. LUND, GREG | ) | |
| A. NATHANSON, and LAWRENCE B. | ) | |
| SORREL, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiffs' Motion for Preliminary Injunction [Docket No. 12], filed on April 16, 2012, pursuant to Rule 65 of the Federal Rules of Civil Procedure.  Plaintiffs, Corre Opportunities Fund, LP, Zazove Associates LLC, DJD Group LLLP, First Derivatives Traders LP, and Kevan A. Fight, seek a preliminary injunction barring Defendants, Emmis Communications Corporation ("Emmis"), Jeffrey H. Smulyan, Patrick M. Walsh, J. Scott Enright, Susan B. Bayh, Gary L. Kaseff, Richard A. Leventhal, Peter A. Lund, Greg A. Nathanson, and Lawrence B. Sorrel, from, *inter*

*alia*, holding a Special Meeting to vote on the Proposed Amendments set forth in

Emmis's March 13, 2012 Preliminary Proxy Statement and from voting, directing others

to vote, or taking any action on votes cast for the Proposed Amendments.

A hearing was held on July 31 and August 1, 2012, at which the parties presented

evidence and oral argument.  Having considered the parties' briefing, the documentary

and testimonial evidence, and oral arguments, the Court hereby <u>DENIES</u> Plaintiffs'

motion for injunctive relief.

### **Factual Background**

**Relevant Rights and Protections of Preferred Stock**

In 1999, Emmis issued 2,875,000 shares of 6.25% Series A Cumulative

Convertible Preferred Stock ("Preferred Stock") for $50 per share, raising approximately

$144 million.  Docket No. 43 ¶ 23.  Plaintiffs are all shareholders who own, or manage

funds that own, more than 800,000 shares of Emmis's Preferred Stock.

Emmis's Articles of Incorporation sets out the rights and protections associated

with the Preferred Stock, which include, *inter alia*: (1) a right to cumulative annual cash

dividends at a rate per annum equal to 6.25% of the stock's $50 liquidation preference;

(2) a bar on Emmis's ability to pay dividends to its common stockholders or to repurchase

securities ranking junior to or ratably with the Preferred Stock unless Emmis is current on

the Preferred Stock dividend payments; (3) a right to sell the stock back to Emmis at $50

per share, plus any outstanding dividends, if the Company goes private; (4) the right to

elect two Emmis directors if dividends are not paid for six consecutive quarters; and (5)

the requirement that any issuance of senior-ranking stock or any adverse amendment to the terms of the Preferred Stock be approved by two-thirds of the outstanding Preferred Stock.  Exh. 7.

**Attempts to Take Emmis Private**

In 2006, Emmis CEO, Jeff Smulyan, proposed to take Emmis private by purchasing the Company's common stock at $15.25 per share.  However, a committee of disinterested directors of the Board of Directors ("the Board") rejected his proposal and Emmis remained a public company.  Smulyan Dep. at 20.  Two years later, in October 2008, Emmis, like other entities in the radio and media industry, was hit hard by the nationwide financial crisis and was forced to cut its workforce, reduce employee benefits, and cut wages and salaries.  Emmis also ceased paying dividends to its Preferred Shareholders at that time and has not paid dividends since.[1]  Docket No. 43 ¶ 24.  The current amount of accrued unpaid dividends is $12.12 per share.  Hornaday Dep. at 30.

In 2010, two years after the financial crisis, the market price of Emmis's Common Stock had fallen to less than $3.00 per share.  Smulyan Dep. at 23.  Mr. Smulyan, fueled by the belief that the Common Stock was undervalued by the market, proposed another go-private transaction.  As part of that deal, Emmis asked the Preferred Shareholders to relinquish their right to sell their stock back to Emmis at $50.00 per share plus unpaid

---

[1] In August 2009, the holders of Emmis's senior debt demanded that loan covenants be amended to prohibit the Company from paying dividends on the Preferred Stock.  This prohibition continues today.  See Exh. 800 § 10.4; Exh. 801 § 5.

dividends (which would have eliminated any potential profit from the go-private transaction) and instead requested that they exchange their shares for subordinated debt instruments.  Exh. 600  That proposed amendment to the terms of the Preferred Stock failed to win the required two-thirds' approval, however.  See Exh. 601.  As a result, Emmis's financier, preferred holder Alden Global Distressed Opportunities Master Fund ("Alden"), pulled out of the deal, and the initiative collapsed.  The pullout eventually led to litigation between Alden and Emmis.  Momtazee Dep. at 144-45; Smulyan Dep. at 31-32.

### Emmis's Proposal to Acquire Preferred Stock Using Total Return Swaps

In the summer of 2011, Emmis's senior management was contacted by a few of the Preferred Shareholders who sought liquidity for their shares.  Hornaday Dep. at 45; Smulyan Dep. at 47; Walsh Dep. at 56-58.  According to Defendants, Emmis recognized the benefits to its capital structure of repurchasing its Preferred Stock at the then-prevailing market rate.  Repurchasing the Preferred Stock for approximately 25 cents on the dollar would be treated by credit rating agencies as the extinguishment of debt at a substantial discount, making it easier for Emmis to refinance senior debt at lower interest rates, which would in turn have the effect of improving the Company's overall financial health, increasing the value of Emmis's common stock and possibly the remaining Preferred Stock as well.  Hornaday Dep. at 33-34, 64-65; Walsh Dep. at 52, 55-56; Momtazee Dep. at 143-44.

In September 2011, Emmis's senior management negotiated with Zell Credit

4

Opportunities Master Fund, LLC ("Zell") for financing that would enable Emmis to repurchase the Preferred Stock. At approximately that same time, in September and October 2011, Emmis began approaching its ten largest Preferred Shareholders[2] to determine whether there was interest in selling. In mid-October, after a sufficient number of the approached Preferred Shareholders had expressed interest in selling their shares at the current market value, Emmis finalized a loan commitment of up to $35 million with Zell (the "Zell Financing") to fund those purchases. Hornaday Dep. at 68-69; Walsh Dep. at 58-60; Exh. 803.

Emmis's senior management presented the proposal to repurchase Preferred Stock using the Zell Financing at the Board's October 25, 2011 meeting. Management explained that repurchasing Emmis's Preferred Stock at a discount with funds borrowed from Zell would benefit the Company. At that meeting, in addition to the presentation made by the senior management team, Emmis's financial advisor, John Momtazee of Moelis & Company along with outside legal counsel advised the Board regarding the proposal. See Exh. 18; Exh. 407.

One of the goals of the purchase proposal was not simply to acquire Preferred Stock, but also to preserve the voting rights of the Preferred Stock it did acquire. Under Indiana law, any shares of Preferred Stock that Emmis acquired through outright

---

[2] Those contacted by Emmis included Plaintiffs Zazove, DJD, and Kevan Fight. Other Preferred Shareholders contacted included Q Investments, Third Point, Valinor, and Alden, all of whom eventually entered into direct sale or total return share transactions with Emmis, and Deutsche Bank, Bradley Radoff, and Luther King, none of whom entered into deals with Emmis.

purchases would have to be retired and could not be voted.  Thus, the Preferred Stock

repurchase proposal included the possibility of using total return swap ("TRS")

transactions[3] and TRS Voting Agreements rather than ordinary purchase agreements,

which proposal was presented to the Board as a way to preserve the voting rights of the

Preferred Stock.  Exh. 18.  Basically, Preferred Shareholders would be offered a price per

share for certain interests in their Preferred Stock; and, although they would lose the

economic rights in those shares, they would retain record ownership of the stock.  In

addition, Emmis would enter into voting agreements with these Preferred Shareholders

pursuant to which they would agree to vote their shares as Emmis directed.  It was

proposed that Emmis would make this offer only to its largest holders of Preferred Stock,

and the Board was informed that, if Emmis succeeded in acquiring two-thirds of the vote,

the use of the total return swaps "would allow flexibility" to seek amendments to the

terms of the Preferred Stock.  Exh. 314.

The proposal was approved by unanimous vote of the directors, including all of its

independent directors as well as the Preferred Shareholders' representative on the Board,

David Gale.  See Exh. 18 at 1.  Gale did express concern regarding what Emmis planned

---

[3] Plaintiffs' expert witness, Edward Adams, explained that total return swaps are
financial derivative contracts in which: "Party A agrees to pay the total returns to Party B in
exchange for Party B making generally periodic payments to Party A.  So if the asset goes up in
value from 50 to a hundred dollars, then Party A is going to pay that to B.  If it goes down in
value, Party B's got to pay that to A.  So what happens in a total return swap is Party B doesn't
really own the asset.  It owns the economics of the asset.  Party A continues to own the asset and
vote it.  Party B has the economics, so if it goes up, Party B benefits.  If it goes down, Party B
pays."  Tr. Vol. 1 at 226.

to do if it acquired voting control of two-thirds of the Preferred Stock.  However, after

being informed that the Board would not take any action on that issue at that meeting, he

ultimately voted in favor of the Preferred Stock repurchase proposal, including the use of

TRS transactions and accompanying TRS Voting Agreements.  Gale Dep. at 32, 42-43.

**Emmis's Acquisition of Preferred Stock Using Total Return Swaps**

With authorization from the Board, Emmis's senior management finalized the Zell

Financing and proceeded with the discussions with the ten targeted Preferred

Shareholders about acquisition of their shares.  On November 10, 2011, Emmis signed the

loan agreement with Zell and the next day announced it would acquire Preferred Stock

from certain holders pursuant to TRS transactions.  Exh. 235; Exh. 803.  Because at that

point Emmis had entered into these discussions with only ten of its Preferred

Shareholders regarding the acquisition of their shares, the announcement that Emmis

made on November 11 was the first notice to the remaining Preferred Shareholders of

Emmis's acquisition plans.  On November 14, 2011, in a 8-K filing submitted to the

Securities Exchange Commission ("SEC"), Emmis disclosed that it had secured the Zell

financing and that it had "entered into securities purchase agreements with certain holders

of its Preferred Stock," and that, "[t]he transactions will settle pursuant to the terms of

total return swaps ..., the terms of which provide that until final settlement of these

arrangements, the seller agree[d] to vote its shares in accordance with the prior written

instructions of Emmis."  Exh. 604.  Emmis further disclosed that it "may enter into

additional transactions to purchase its Preferred Stock in the future.  Id.  According to an

8-K form filed on November 15, 2011, Emmis had already acquired 645,504 shares of Preferred Stock, mainly through TRS transactions,[4] and, by that date, had secured the ability to direct the vote of approximately 23% of the Preferred Stock.  Exh. 605.

One week later, on November 22, 2011, as part of a broader agreement to settle all litigation related to its pullout from the 2010 go-private transaction, Alden Capital agreed to enter into a TRS transaction with Emmis involving over 1,000,000 shares of Preferred Stock.  These shares represented approximately 34% of the outstanding Preferred Stock and increased the percentage of shares over which Emmis had secured voting control to 56.8%.  Exh. 607.  Defendants claim that it was only at this point that Emmis's senior management first believed that the Company might be able to gain control of two-thirds of the outstanding shares of the Preferred Stock.

On that same day, the Board met to discuss the merits of a tender offer and the implications of acquiring voting control over at least two-thirds of the outstanding Preferred Stock.  The minutes of that meeting state that no decision was being made at that time "with respect to any possible amendments to the terms of the preferred stock," and that, "such a determination, if any," would be made at a separate meeting.  Exh. 6. The Board did, however, approve by an 8-1 margin[5] a modified "Dutch auction" tender

---

[4] Adam Peach of Q Investments, one of the Preferred Shareholders approached by Emmis, preferred that Emmis make a straight purchase of its Preferred Stock rather than by using a TRS and Emmis agreed to structure the transaction in such a manner.  Enright Dep. at 58-59.

[5] Gale, the Preferred Shareholders' representative on the Board was the only dissenter.

offer for its Preferred Stock at the November 22 meeting.  Id.

**The Dutch Auction Tender Offer**

On November 30, 2011, Emmis announced that it would conduct a modified Dutch

auction tender offer to purchase up to $6 million in Preferred Stock at a price between

$12.50 and $15.56 per share.  The next day, on December 1, 2011, Emmis submitted its

tender offer filing to the SEC.  In that filing, Emmis stated that if it succeeded in

obtaining two-thirds of the vote, it "may elect to, among other things, amend various

provisions applicable to the Preferred Shares."  Exh. 609.  By December 12, 2011, in

response to the disclosures made in Emmis's December 1 filing, four of the five Plaintiffs

had entered into a formal lockup agreement in an attempt to gain a blocking position by

controlling at least one-third of the vote of the Preferred Stock.[6]  See Exhs. 221, 230, 238,

308.

On January 5, 2012, Emmis announced that it had purchased through the

December tender offer 164,400 shares of Preferred Stock.  Because those shares were

purchased rather than acquired through TRS transactions, they were retired and returned

to the status of authorized but unissued Preferred Stock, thereby reducing the number of

shares of outstanding Preferred Stock, which in turn increased the percentage of shares

---

[6] There is evidence in the record that Plaintiffs suspected that Emmis's plan was to gain voting control of two-thirds of the Preferred Stock in order to amend its terms at or before the time that Emmis filed its tender offer statement.  On November 22, 2011, Plaintiffs Zazove, Corre, and Fight expressed this belief to the SEC by letter.  Exh. 219.  Representatives of Plaintiffs DJD Group and First Derivative testified by deposition that they had a similar understanding following the December 1 tender offer statement.  Exh. 904 at 58-59; Exh. 909 at 14, 23, 26.

over which Emmis controlled the vote to 60.6%. <u>See</u> Exh. 616 at 14.

On January 20, 2012, with the term of the Zell Financing set to expire within two weeks, Emmis used the last of those funds to purchase and retire an additional 25,700 shares of Preferred Stock at prices of up to $30 per share. Emmis announced the acquisition in its January 30, 2012 Form 8-K, stating that the total of "authorized but unissued" shares had reached 452,680, and that, if it reissued 390,604 of those shares to a third party with a voting agreement allowing Emmis to direct the vote, it would have voting control over two-thirds of the Preferred Stock. Exh. 611. In the Form 8-K, Emmis further disclosed that, if it were able to acquire voting control, it "may elect" to use that power to amend the rights of the Preferred Shareholders. <u>Id.</u>

**Creation of Employee Retention Plan Trust and Reissuance of Preferred Stock**

In January 2012, Emmis entered into negotiations with its lenders, Zell and Canyon Capital Advisors, whereby Emmis proposed to reissue to the lenders approximately 400,000 shares of Preferred Stock which amount was needed to reach the two-thirds threshold. However, in early February 2012, Zell and Canyon concluded that the possible return on an investment in the Preferred Stock was not worth the risk of litigation with the lockup group and declined to invest. <u>See</u> Exh. 12; Exh. 13.

Once negotiations with Zell and Canyon stalled, Emmis's senior management decided to create an employee benefit plan trust ("the Retention Plan Trust") to which it could issue the 400,000 shares of Preferred Stock, which would be voted as directed by

the Board.[7]  On February 29, 2012, senior management presented this idea to the Board, which approved the plan at its March 8, 2012 meeting.  Exh. 804; Exh. 805.  According to Defendants, there were two purposes for creating the Retention Plan Trust; first, to enable Emmis to acquire voting control over two-thirds of the Preferred Stock, and second, to provide a means of retaining and rewarding employees who remained with the company for at least two years.[8]  Enright Dep. at 26.

Before the proxy for approval of the Retention Plan Trust was tendered, Emmis made a separate filing on March 13, 2012, announcing its intention to conduct a vote amending the rights of the remaining Preferred Shareholders by using the shares that it planned to issue to the not-yet-created Trust.  The March 13 filing also noted that the shares in the Retention Plan Trust would vote in favor of the proposed amendments.  Exh. 24.  On April 2, 2012, the Trust, with Mr. Smulyan as Trustee, was approved by shareholder vote.  Emmis then contributed 400,000 shares of Preferred Stock in return for a voting agreement allowing the Company to direct the vote of those shares, giving Emmis control of over two-thirds of the Preferred Stock.  See Exh. 613 at 69.

**Board Approval and Disclosure of Proposed Amendments**

At the February 29 and March 8 Board meetings when the Retention Plan Trust

---

[7] Indiana law allows corporations to vote their own shares when held "in or for an employee benefit plan."  IND. CODE § 23-1-30-2(c).

[8] At the time the Retention Plan Trust was created, Emmis already had other employee benefit plans in place, including a 2010 Equity Compensation Plan with 2.2 million shares of Emmis common stock available for grant.  Exh. 613.

was discussed and adopted, the Board for the first time also discussed the details of

specific Amendments to the Articles of Incorporation affecting the terms of the Preferred

Stock (at the February 29 meeting) and approved the Proposed Amendments for

consideration by the Company's shareholders (at the March 8 meeting).  Exh. 804; Exh.

805.  The Proposed Amendments would, *inter alia*: (1) eliminate Emmis's obligation to

pay Preferred Stock dividends accumulated since October 2008; (2) change the Preferred

Stock from "Cumulative" to "Non-Cumulative"; (3) eliminate the right of Preferred

Shareholders to elect directors in the event of nonpayment of dividends; (4) remove the

restrictions on Emmis's ability to pay dividends or make distributions on or repurchase its

Common Stock or other junior stock prior to paying accumulated dividends or

distributions on the Preferred Stock; and (5) eliminate the right of the holders of the

Preferred Stock to require Emmis to repurchase all of their shares upon certain going-

private transactions.  See Exh. 24.

Emmis filed a preliminary proxy statement on March 13, 2012, in which it

disclosed the exact terms of the Proposed Amendments and its expectation that the

holders of two-thirds of the Preferred Stock would vote in favor of the Amendments,

based on the terms of the TRS and Retention Plan Trust Voting Agreements.  Id.  The

preliminary proxy also provided as follows:

> The Emmis board of directors, with the exception of Dave Gale who was
> appointed as a director by the holders of the Preferred Stock, believes the
> Proposed Amendments will have a positive effect on the overall capital
> structure of Emmis, which will have a beneficial impact on holders of the
> Common Stock.  Accordingly, the board of directors, with the exception of

Mr. Gale, believes that the Proposed Amendments are in the best interests of Emmis and the holders of the Common Stock and recommends that the holders of the Common Stock vote **FOR** the Proposed Amendments.

Id. at 6.

**The Instant Litigation**

On April 16, 2012, Plaintiffs filed their Complaint as well as the instant motion for injunctive relief, alleging that Defendants' acquisition of Preferred Stock through TRS transactions and the reissuance of Preferred Stock to the Retention Plan Trust violated various federal securities laws as well as the laws governing the conduct of Indiana corporations.

## Legal Analysis

**I.     Standard of Review**

The grant of injunctive relief is appropriate if the moving party is able to demonstrate: (1) a reasonable likelihood of succeeding on the merits; (2) irreparable harm if preliminary relief is denied; and (3) an inadequate remedy at law.  Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008).  If the moving party fails to demonstrate any one of these three threshold requirements, the emergency relief must be denied.  Id.  However, if these threshold conditions are met, the Court must then assess the balance of harm – the harm to Plaintiffs if the injunction is not issued against the harm to Defendants if it is issued – and, where appropriate, also determine what effect the granting or denying of the injunction would have on nonparties (the public interest).  Id.

13

In determining whether to grant injunctive relief, the district court must take into account all four of these factors and then "exercise its discretion 'to arrive at a decision based on the subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." Id. (quoting Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th Cir. 1986)).  This process involves engaging in what is called the "sliding scale" approach, meaning that "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992) (citations omitted).  The sliding scale approach "is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting Abbott Labs., 971 F.2d at 12).

## II.      Likelihood of Success on the Merits

### A.      State Law Claims

#### 1.      Breach of Contract

Plaintiffs contend that Emmis's acquisition of Preferred Stock breached Section 3.3 of Emmis's Articles of Incorporation ("the Articles"), which governs the Preferred Shareholders' rights, and that Emmis's re-issuance of acquired Preferred Stock to the 2012 Retention Plan Trust breached Section 7.3 of that same agreement.  We address these claims in turn.

14

### a.  Section 3.3

Section 3.3 provides in relevant part as follows:

> [N]o Common Stock or any other stock of the Corporation ranking junior to
> or ratably with the Preferred Stock as to dividends ... may be redeemed,
> purchased or otherwise acquired for any consideration ... by the Corporation
> ... unless full Accumulated Dividends shall have been or
> contemporaneously are paid or declared and a sum sufficient for the
> payment thereof is set apart for such payment on the Preferred Stock for all
> Dividend Payment Periods terminating on or prior to the date of such
> declaration, payment, redemption, purchase or acquisition.

Exh. 7 at EM 0007061.

It is undisputed that, between October 2011 and January 2012, Emmis acquired

shares of Preferred Stock without first paying accumulated dividends to the Preferred

Shareholders.  Thus, we turn to the question of whether Preferred Stock constitutes stock

"ranking junior to or ratably with the Preferred Stock."  When interpreting contract terms,

"[u]nless the terms of the contract are ambiguous, they will be given their plain and

ordinary meaning.  Tanton v. Grochow, 707 N.E.2d 1010, 1013 (Ind. Ct. App. 1999)

(citation omitted).  Courts are to "construe the contract as a whole and consider all

provisions of the contract, not just the individual words, phrases, or paragraphs."

Brotherhood Mut. Ins. Co. v. Michiana Contracting, Inc., 971 N.E.2d 127, 131 (Ind. Ct.

App. 2012) (citation omitted).

Plaintiffs contend that Defendants' acquisition of Preferred Stock without first

paying dividends violated Section 3.3 because the phrase "any other stock ... ranking

junior to or ratably with the Preferred Stock" encompasses the Preferred Stock itself.

Plaintiffs argue that the plain and ordinary meaning of "ratable" is "pro rata" or "proportional," and thus, that shares of Preferred Stock "rank ratably with" other shares of Preferred Stock as to dividends.  In further support of their argument, Plaintiffs point to Section 7.3 of Emmis's Articles of Incorporation, which refers to: "shares of preferred stock which rank ratably with the Preferred Stock (*including the issuance of additional shares of the Preferred Stock*)." (emphasis added).  Plaintiffs contend that because there is no indication that the phrase was intended to have varying definitions throughout the agreement, stock "ranking ratably with Preferred Stock" in Section 3.3 should be interpreted to include the Preferred Stock itself.

However, as Defendants argue, if the intent of Section 3.3 was in fact to prohibit Emmis's acquisition of the Preferred Stock itself, the Section would have provided that Emmis could only acquire stock ranking *senior* to the Preferred Stock or added the phrase "including the Preferred Stock" after "ratably with the Preferred Stock," as Section 7.3 of the Articles does.  The fact that such language was used in Section 7.3 of the same agreement demonstrates that when the drafters intended to include Preferred Stock as stock that "ranks ratably" with itself, they knew how to make that distinction and they clearly expressed that intent.  Because Section 3.3 does not include such a distinction, it suggests that the drafters did not intend that meaning to be read into the provision.  Moreover, because Preferred Stock *is* Preferred Stock, it is logical to conclude that stock that ranks ratably *with* Preferred Stock must be some other series of stock.

For the foregoing reasons, we find that Plaintiffs have failed to establish that they

have a reasonable likelihood of success in proving that Defendants' acquisition of

Preferred Stock through the TRS transactions constituted a breach of Section 3.3 of the

Articles.

### b.    Section 7.3

Section 7.3 provides in relevant part as follows:

> The affirmative vote or consent of the holders of at least 66 2/3% of the
> outstanding Preferred Stock will be required for the issuance of any class or
> series of stock, or security convertible into the Corporation's stock, ranking
> senior to the Preferred Stock as to dividends, liquidation rights or voting
> rights and for amendments to the Corporation's Articles of Incorporation
> that would adversely affect the rights of holders of the Preferred Stock;
> *provided however*, that any issuance of shares of preferred stock which rank
> ratably with the Preferred Stock (including the issuance of additional shares
> of the Preferred Stock) will not, by itself, be deemed to adversely affect the
> rights of the holders of the Preferred Stock.  In all such cases, each share of
> Preferred Stock will be entitled to one vote.

Exh. 7 at EM 0007065 (emphasis in original).

Plaintiffs argue that both the Preferred Stock acquired through TRS transactions

and the Preferred Stock reissued to the Retention Plan Trust constitute classes of stock

ranking senior to voting rights of the originally issued Preferred Stock, and thus, because

Emmis did not receive the affirmative vote of two-thirds of the outstanding Preferred

Stock before engaging in such actions, it breached Section 7.3.  Basically, Plaintiffs argue

that the "TRS Preferred Stock" and "Retention Plan Preferred Stock" are senior to the

Preferred Stock they own because embedded within each TRS and Retention Plan share is

a vote to eliminate the rights of the Preferred Stock.  In other words, Plaintiffs' argument

is that the embedded voting shares are senior to Preferred Stock because they constitute

an automatic block of votes, and thus are in essence the same as one super-share with

hundreds of thousands of votes.

In support of their argument, Plaintiffs point to an internal memorandum produced

by Emmis's accounting firm, Ernst & Young, which concludes with reference to the

Preferred Stock acquired through the TRS transactions that, for accounting purposes,

those acquisitions should be considered "the issuance of a new 'modified' preferred

stock."  Exh. 109.  However, this characterization for accounting purposes of the TRS

Preferred Stock by Defendants' accounting firm is largely irrelevant for our purposes, to

wit, in determining whether Defendants' actions violated the rights of the Preferred

Shareholders, which are governed solely by the Articles and applicable provisions of the

IBCL.

Moreover, the mere fact that newly issued shares will affect the outcome of a

shareholder vote does not automatically transform those shares into a senior class of

stock.  As Defendants point out, whenever authorized shares of an Indiana corporation are

available for issuance, shareholders of that corporation bear the risk that the corporation's

decision to issue new shares of an existing class will alter the outcome of an election.

Thus, the only question currently before us is whether the Board had the power to issue

the shares under the Articles, and, in so doing, whether it acted in accordance with the

standards prescribed in the IBCL.

Section 10.2 of Exhibit A to the Articles addresses the reacquisition and reissuance

of the Preferred Stock, providing as follows:

> Shares of Preferred Stock issued and reacquired will be retired and canceled promptly after reacquisition thereof and, upon compliance with the applicable requirements of Indiana law, have the status of authorized but unissued shares of preferred stock of the Corporation undesignated as to series and may with any and all other authorized but unissued shares of preferred stock of the Corporation be designated or redesignated and issued or reissued, as the case may be, as part of any series of preferred stock of the Corporation, except that any issuance or reissuance of shares of Preferred Stock must be in compliance with [Exhibit A to the Articles].

Exh. 7 at EM0007072.  Section 8.1 of the Articles also empowers the Board to designate series of preferred shares having the voting rights, preferences, and other rights determined by the Board.  Id. at EM 0007050.  These provisions clearly authorize the Board to reissue previously retired Preferred Stock without first receiving two-thirds approval as long as it is not senior to the Preferred Stock.  In connection with the issuance of the Retention Plan Preferred Stock, the Board designated the shares issued as Preferred Stock having the voting rights, preferences and other rights of Preferred Stock, and thus, those shares were Preferred Stock, not a senior class of stock.  There is nothing about the fact that Emmis can direct the votes of those shares that automatically transforms the Retention Plan Preferred Stock into a senior class of stock.

For the foregoing reasons, we conclude that Plaintiffs have failed to demonstrate a likelihood of prevailing on the merits with regard to establishing that Defendants' acquisition of TRS Preferred Stock or reissuance of Retention Plan Preferred Stock breached Section 7.3 of the Articles.

**2.      Indiana Code § 23-1-30-2**

19

### a.   Stock acquired through TRS transactions[9]

Plaintiffs argue that Defendants cannot vote the shares of Preferred Stock they acquired through total return swaps because they are no longer "outstanding" as defined by Indiana statute.  According to Plaintiffs, regardless of the label Defendants put on those transactions, they were sales in all respects but name, and consequently, the TRS shares should have been retired.  Defendants rejoin that the total return swaps were not sales.  Emmis made no outright purchases of those shares (because the Preferred Shareholder counterparties retain record ownership), and thus, that the TRS shares remain outstanding and retain their voting rights.  Defendants maintain that they are authorized to direct the vote of the TRS shares pursuant to the voting agreements executed by the Preferred Shareholder counterparties as part of the total return swap.

It is undisputed that the transactions Defendants call total return swaps are not typical TRS transactions.[10]  However, the label given to the transaction is largely immaterial for our purposes.  The court's task here is not to determine whether the transactions in fact fit the mold of what is traditionally called a total return swap, but rather to determine whether, regardless of the label given to the transaction, the manner in which Defendants structured the transactions to ensure the shares remain outstanding is permissible under Indiana law.

---

[9] Because of the interplay between this state claim and Plaintiffs' federal claim brought pursuant to Section 14(a) of the Securities Exchange Act, we address both claims in this section.

[10] Defendants' own expert witness testified that it is "an unusual form of a total return swap."  Tr. Vol. 1 at 248.

The Indiana Business Corporation Law ("IBCL") expressly allows Indiana corporations to vote and "deal in" their own shares except as otherwise prohibited in the statute.  IND. CODE § 23-1-22-2(6).  Indiana Code § 23-1-30-2(a) grants voting rights to shares that are "outstanding."  Under Indiana law, issued shares remain outstanding "until they are reacquired, redeemed, converted, or cancelled."  IND. CODE § 23-1-25-3.  Emmis's Articles provide that, in accordance with Indiana law, shares that are reacquired by the company "will be retired and canceled promptly after reacquisition."  Exh. 7 at EM0007072.

Plaintiffs contend that, although the Preferred Shareholder counterparties retain record ownership, the TRS transactions are nevertheless tantamount to sales because Emmis acquired everything of value, to wit, both the economic rights and the right to direct the vote of the shares pursuant to the accompanying voting agreements.[11]  However, although they clearly effected a substantial transfer of interest, these transactions were not *complete* exchanges of the entire bundle of rights of ownership.  Further, they do not reflect the parties' intention to transfer *all* ownership rights, as evidenced by the fact that the counterparties to the transactions retain record ownership of the shares, which is one traditional indicia of ownership.  See Meridian Mortg. Co. v. Indiana, 395 N.E.2d 433, 439 (Ind. Ct. App. 1979) (discussing general indicia of

---

[11] In materials submitted to the SEC, Emmis concedes that it represented that the total return swap "arrangement had the same economic and voting effect as a purchase of those shares."  Exh. 608 at EM0010759.  However, this characterization is not controlling here as to whether Defendants acted in contravention of the applicable provisions of the IBCL in structuring the transactions in the manner that they did.

ownership as including title, possession, and control).  As both parties' experts conceded at the hearing, while unusual, nothing prohibits two consenting parties from disaggregating the bundle of ownership rights and tailoring a transaction in such a manner.  Moreover, although we concede that it is difficult to articulate what concrete value remains with mere record ownership, it is not meaningless under Indiana law.  The IBCL provides that one definition of "shareholder" is "the person in whose name shares are registered in the records of a corporation."  IND. CODE § 23-1-20-24.  Similarly, Section 2.10 of Emmis's bylaws state that "[t]he original stock register or transfer book ... shall be the only evidence as to who are the Shareholders entitled ... to notice of or to vote at any meeting."  Exh. 626.

Given these facts, we cannot conclude that Plaintiffs are likely to succeed in establishing that the TRS Stock is not outstanding, at least not within the meaning of the IBCL, since record ownership remains with the Preferred Shareholder counterparty.  Nor have Plaintiffs shown a likelihood of success in establishing that Emmis cannot lawfully direct the vote of the TRS Stock via the TRS Voting Agreements.  The IBCL expressly authorizes voting agreements between two or more shareholders providing for "the manner in which they will vote their shares."  IND. CODE § 23-1-31-2.  Moreover, the only limitation on the general rule that each outstanding share is entitled to vote is contained in Indiana Code § 23-1-30-2(b), which prohibits a subsidiary from voting the shares of its parent if the parent owns a majority of the subsidiary's shares.  The Official Comments make clear, however, that subsection (b) "does not prohibit ... *the voting of a*

*corporation's own shares in other circumstances where the corporation may have the power to direct the voting*, such as shares owned by a limited partnership of which the corporation is the general partner." (emphasis added).

In sum, unlike statutes governing corporations in certain other states, the IBCL expressly permits an Indiana corporation to vote its own shares.  The IBCL also affords the board of directors broad discretion to act in the best interest of the corporation unless otherwise prohibited by the statute.  Although the manner in which Defendants structured the TRS transactions to retain the voting rights is admittedly unusual, having clearly been creatively devised to serve the company's purposes, we are not persuaded that Plaintiffs are likely to prevail on a claim that the IBCL prohibits their actions.

Plaintiffs contend that, if the TRS transactions are not deemed sales, then Defendants violated Section 14(a) of the Securities Exchange Act by failing to file a proxy solicitation statement in connection with their solicitation of irrevocable proxies from the Preferred Shareholders who participated in the TRS transactions.  The purpose behind the proxy solicitation rules is to ensure that a shareholder who retains an economic interest in a corporation but is being asked to relinquish his voting rights receives adequate notice so the shareholder is able to make an informed decision regarding whether to relinquish those rights.  However, there is an exception set forth in Rule 14a-2 to the general rule, which provides that disclosures required in accordance with proxy solicitations are not required for "[a]ny solicitation by a person in respect of securities of which he is the beneficial owner."  17 C.F.R. § 240.14(a)-2(a)(2).  In such cases,

disclosures are not required because the voting rights follow the economics of the stock. Similarly, with regard to the TRS transactions, Emmis acquired both the economic rights as well as the voting rights of the stock. Accordingly, we hold that Plaintiffs are unlikely to succeed on their claim that Defendants violated Section 14(a) by failing to file a proxy solicitation statement under these circumstances.

### b. Stock reissued to Retention Plan Trust

Under Indiana Code § 23-1-30-2(c), a corporation is allowed to "vote any shares, including its own shares, held by it in or for an employee benefit plan or in any other fiduciary capacity." Plaintiffs argue that, despite this clear and unconditional allowance under Indiana law, Defendants should nevertheless be prohibited from voting the 400,000 shares of the Preferred Stock that they reissued to the Retention Plan Trust because the Trust is a "sham," created not for the benefit of Emmis employees, but solely to allow Emmis to strip away the rights of the remaining holders of the Preferred Stock.

The only authority Plaintiffs cite in support of this argument is the Southern District of Ohio's decision in <u>NCR Corporation v. AT&T Co.</u>, 761 F. Supp. 475 (S.D. Ohio 1991), in which the court, applying Maryland law, held that an employee stock ownership plan ("ESOP") created by NSR was invalid and unenforceable because the primary purpose of the ESOP was to thwart a competitor's takeover offer rather than to provide employees with benefits, and thus, was in violation of Maryland's "primary purpose test." Under Maryland law, the "primary purpose test" is applied to determine the validity of stock issuances that have the effect of consolidating or perpetuating

24

management control.  See Mountain Manor Realty, Inc. v. Buccheri, 461 A.2d 45, 53

(Md. Ct. Spec. App. 1983).  Under that test, transactions can be deemed invalid if a court

finds "that the purpose of the transaction was primarily one of management's self-

perpetuation and that that purpose outweighed any other legitimate business purpose."  Id.

It is undisputed that one purpose of Emmis's creating the Retention Plan Trust and

reissuing to it the 400,000 shares of Preferred Stock was to sufficiently dilute the number

of Preferred Stock shares to enable Defendants to acquire voting control.  However,

Plaintiffs are unlikely to be successful in establishing that such a purpose or strategy

renders the employee benefit plan invalid under Indiana law, thereby preventing

Defendants from voting those shares.  Plaintiffs have not pointed to, nor are we aware of

any test under Indiana law similar to Maryland's primary purpose test.  To the contrary,

the IBCL expressly repudiates the application of legal decisions from other states that

apply stricter scrutiny on directors' decisions than that provided for under Indiana's

business judgment rule, which states in relevant part as follows:

> Certain judicial decisions in Delaware and other jurisdictions, which might
> otherwise be looked to for guidance in interpreting Indiana corporate law,
> including decisions relating to potential change of control transactions that
> impose a different or higher degree of scrutiny on actions taken by directors
> in response to a proposed acquisition of control of the corporation, are
> inconsistent with the proper application of the business judgment rule under
> this article.

IND. CODE § 23-1-35-1(f); see also 20 Indiana Practice § 47.11 n.11 (citing NCR as an

example of a case that would be inapplicable under Indiana law).

Indiana law clearly provides that a corporation may vote its own shares if they are

25

held in an employee benefit plan.  It imposes no further qualifications on the creation of such a plan.  In the case at bar, the Board exercised its business judgment in deciding to approve the resolutions establishing the Retention Plan Trust and in allowing Emmis to direct the vote of the stock placed therein, a decision of which a majority of the disinterested directors approved.  Although Plaintiffs accuse Defendants of nefarious motives in creating the Retention Plan Trust, the evidence shows that Emmis employees have been told that the shares placed in the Trust were placed there for their benefit and will be available for distribution to employees who remain with the company for at least two years.[12]  Given these facts, Plaintiffs have failed to establish that they have a reasonable likelihood of establishing that the Retention Plan Trust is nothing more than an illegal sham, the creation of which violates Indiana law.

**B.    Federal Claims**

**1.    Tender Offer Disclosures**

Plaintiffs contend that Defendants violated Sections 13(e), 14(e), and 10(b) of the Securities Exchange Act by failing to file a tender offer statement in October or November 2011 before soliciting Preferred Shareholders to enter into the TRS transactions.[13]  Defendants rejoin that the TRS transactions do not constitute a tender

---

[12] The mechanics of distributing these shares to employees are not completely clear. Without more, we will not speculate regarding those details, concluding only that the evidence establishes that the Board acted in accordance with the standards of conduct prescribed in the IBCL when it created the Retention Plan Trust.

[13] In their briefing, Plaintiffs cursorily address a claim brought pursuant to Section 20(a).
(continued...)

offer, but rather are privately negotiated transactions that did not require disclosure.

The purpose of the Williams Act amendments to the Exchange Act, which added Sections 13(e) and 14(e), "was to insure that public shareholders facing a tender offer or the acquisition by a third party of large block of shares possibly involving a contest for control be armed with adequate information about the qualifications and intentions of the party making the offer or acquiring the shares."  Indiana Nat. Corp. v. Rich, 712 F.2d 1180, 1183 (7th Cir. 1983) (citations omitted).  The Williams Act requires "'the disclosure of pertinent information to stockholders when persons seek to obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities.'"  Id. (quoting 113 Cong. Rec. 854 (1967)).  Neither the Williams Act nor the SEC's regulations define "tender offer," and, as a result, the Seventh Circuit has recognized that the term "has been frustratingly difficult to encapsulate."  Lerro v. Quaker Oats Co., 84 F.3d 239, 246 (7th Cir. 1996).

In assessing whether a tender offer occurred, courts have often applied an eight-factor test for determining what constitutes a tender offer set forth in Wellman v. Dickinson, 475 F. Supp. 783 (S.D.N.Y. 1979), aff'd on other grounds, 682 F.2d 355 (2d Cir. 1982).  The eight factors are:

(1) active and widespread solicitation of public shareholders for the shares

_____

[13](...continued)
 However, because the specifics of that claim were largely undeveloped, both in the briefing and at the preliminary injunction hearing, we do not address that claim further at this time.

of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only a limited period of time; (7) offeree subjected to pressure to sell his stock ... [and (8)] whether the public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target company's securities.

475 F. Supp. at 823-24 (citing Hoover Co. v. Fuqua Indus., Inc., No. C79-106 2A, 1979 WL 1244, at *4 (N.D. Ohio June 11, 1979)).  This list is not "a mandatory 'litmus test,'" however, and "in any given case a solicitation may constitute a tender offer even though some of the eight factors are absent or, when many factors are present, the solicitation may nevertheless not amount to a tender offer because the missing factors outweigh those present."  Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 57 (2d Cir. 1985) (citations omitted).  In making this determination, courts also consider whether, "viewing the transaction in the light of the totality of circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures of [the Williams Act] are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them."  Id.

Of the eight factors set forth in Wellman, only the second factor is clearly met here: Defendants sought to purchase a substantial percentage of the Preferred Stock, approaching shareholders holding over 70% of the Preferred Stock, and successfully acquiring 59.9% of the outstanding shares of the Preferred Stock through the TRS transactions.  The other factors are not so clearly satisfied, however.  Although

28

Defendants set out to acquire a substantial percentage of the outstanding Preferred Stock, they approached only ten out of the approximately 300 Preferred Shareholders.  We simply cannot conclude that in approaching such a small number of shareholders Emmis engaged in active and widespread solicitation.  See, e.g., Stromfeld v. Great Atlantic & Pacific Tea Co., Inc., 484 F. Supp. 1264, 1272-73 (S.D.N.Y. 1980) (purchasing 42% of the target's stock from seven shareholders was not active and widespread solicitation).  It is undisputed that the offered price, at approximately $15/share, was not significantly over the prevailing market price, and thus, the third Wellman factor clearly is not met here.

The fourth factor, to wit, whether the terms of the deal were firm rather than negotiable, also does not suffice here as evidence of a tender offer.  It is true that, as a whole, the evidence establishes that the price per share was fairly well set and that Defendants were firm in their desire to structure the transactions as total return swaps as opposed to outright purchases.  However, the evidence submitted to us shows that the terms of the offer were, nonetheless, negotiable.  For example, as Defendants point out, the range in the price per share paid to each of the five shareholders who decided to sell differed slightly, from $15.00 to $15.75, based on individual negotiations.  Additionally, although Defendants made clear their preference to acquire the shares through total return swaps, they did agree to an outright purchase with one of the five selling Preferred Shareholders who would not consent to structuring the transaction as a total return swap.

The fifth and sixth factors also are not satisfied here in that Defendants did not

make the offers contingent on purchasing any set minimum or maximum number of shares of the Preferred Stock nor did Defendants impose any specific time limitation on those offers.  It is true, as Plaintiffs point out, that, based on the amount of financing Defendants had available and the price per share they offered for the Preferred Stock, Defendants did not have enough money available to them to acquire all outstanding shares of Preferred Stock at the offered price.  Thus, there was a practical limitation on the number of shares that Defendants were able to buy, and when the financing ran out, presumably time would be up, but in any event the offers were not made contingent on any set threshold nor did the funding available actually limited the purchases to a maximum number of shares as additional funds remained available after Defendants had completed the deals with the five Preferred Shareholders who chose to liquidate their stock.

There is insufficient evidence before us from which we can conclude that Defendants exerted untoward pressure to sell on the Preferred Shareholders whom they had approached regarding the acquisition of Preferred Stock.  The only evidence regarding this factor is the testimony of John Barrett, a portfolio manager with Corre who was not one of the ten Preferred Shareholders approached by Defendants, but who contacted Emmis in November 2011, after learning that Defendants were acquiring shares from some of the Preferred Shareholders.  Mr. Barrett testified that he spoke with Pat Walsh, Emmis's Vice-President, COO/CFO, who advised him that Corre should sell its Preferred Stock because Emmis was trying to acquire two-thirds of the Preferred Stock in

order to amend the terms and "if that happened, [Corre] didn't want to be in the preferred."  Tr. Vol. 1 at 32.  Mr. Barrett further testified that Mr. Walsh had said to him "you're in a prisoner's dilemma" and "you don't want to be the last guy to act because there might not be room for [Emmis] to buy your shares."  Id.  Mr. Walsh testified that he does not recall making such statements and that "it would have been so not [his] style," especially because he had been advised by counsel that, when contacting shareholders, Emmis could not engage in coercive tactics.  Id. at 93.

Even assuming Mr. Barrett's account to be true, we are not persuaded that such statements are sufficient to satisfy the seventh Wellman factor.  It is true that investors likely considered the fact that there was limited available financing in making their decisions whether to enter into transactions with Defendants.  However, in assessing whether a tender offer occurred, courts consider the level of sophistication of the investors approached.  See, e.g., Astronics Corp. v. Protective Closures Co., Inc., 561 F. Supp. 329, 336 (W.D.N.Y. 1983) (in assessing the seventh Wellman factor, observing that the investors were "hardly the uninformed security holder[s], unable to fend for [themselves], who [need] the protection of the Williams Act") (citation omitted).  Here, it is clear that the Preferred Shareholders with whom Defendants dealt were indeed sophisticated investors fully capable of assessing the merits of the deal presented to them. In fact, a number of the Preferred Shareholders who were contacted – including all of the Plaintiffs contacted – declined to enter into any sale or other transaction with Defendants and in some cases even purchased additional shares of Preferred Stock.  Nor is there

evidence to show that any of the five Preferred Shareholders who did decide to make deals with Defendants were subjected to pressure in an effort to induce them to tender their shares.

Finally, with regard to the eighth Wellman factor, it is undisputed that the transactions were not preceded by a public announcement or accompanied by any other publicity.

In sum, although Defendants' solicitations were made for a substantial percentage of the Preferred Stock, Plaintiffs have failed to show a reasonable likelihood of success in establishing that any of the other indicia of a tender offer arise here.  Because the "sole purpose of the Williams Act [is] the protection of investors who are confronted with a tender offer," Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 35 (1977), Plaintiffs have failed to establish a reasonable likelihood of success on their claim that Defendants were required to have filed a tender offer statement before undertaking negotiations with Preferred Shareholders in October and November 2011.

### 2. Statements in Schedule TO-I and Form 8-K Filings in December 2011 and January 2012

#### a. Plan to Amend Preferred Shareholders' Rights

On December 1, 2011, Defendants filed a tender offer statement on Schedule TO-I for the modified Dutch auction tender offer.  In that filing, Emmis stated in relevant part as follows:

> Although our Board of Directors has not made any determinations with respect to making amendments to the terms of the Preferred Shares, if we

32

are able to obtain the ability to direct the vote of at least 66 2/3% of the issued and outstanding Preferred Shares following the completion of the [Dutch auction tender offer], *we may elect to, among other things, amend various provisions applicable to the Preferred Shares*, including but not limited to [removing or reducing the liquidation preference, removing the right to have shares repurchased after a going-private transaction, and removing the company's obligation to pay accrued dividends].

Exh. 609 at xii-xiii (emphasis added).  This statement remained unaltered in the amendments to the December 1 tender offer statement that Defendants filed on December 2, 12, and 14, 2011, and January 3 and 5, 2012, and was repeated in Defendants' January 30, 2012 Form 8-K filing.

Plaintiffs argue that it was false and misleading for Defendants to have represented merely that they "may elect" to amend the rights of the Preferred Shareholders, rather than acknowledging that it was in fact their "intent" to amend the Preferred Shareholders' rights, if they obtained voting control, and thus, Defendants violated Sections 13(e), 14(e), and 10(b).  The evidence adduced at the hearing does not support Plaintiffs' theory, however.  At most, the evidence shows that, by December 1, 2011, Emmis's *senior management* intended to amend the terms of the Preferred Stock, if the company succeeded in acquiring the requisite two-thirds of the vote.  But, it was not clear at the time the tender offer and subsequent amendments were filed whether the *Board*, which would have to authorize any such plan, shared that intention, so the representation that the Board "may elect" appears to have been accurate.

The cases cited by Plaintiffs in support of their contention that intentions must be disclosed are inapposite.  See Champion Parts Rebuilders, Inc. v. Cormier Corp., 661 F.

Supp. 825, 850-51 (N.D. Ill. 1987) (holding that defendants were required to disclose their "plans and intentions" despite their "then-present inability to accomplish those plans"); E.ON AG v. Acciona, S.A., 2007 WL 316874, at *11 (S.D.N.Y. Feb. 5, 2007) (holding that shareholder's claim that it did not know if business combination would be achieved "did not relieve it of its duty to disclose that its goal in making its investment was to achieve the combination"). These cases both dealt with private groups of shareholders who were not governed by a board of directors. In such circumstances, there is good reason to require those individuals to disclose their intentions because, once their intentions are established, no further authorization is required before they can be implemented. Emmis, on the other hand, could act only with authorization from its Board.

Here, the evidence discloses that the Board had discussed the possibility of amending the terms of the Preferred Stock at the time Defendants' tender offer was filed on December 1, 2011 and the amendments were filed in January 2012. As of these dates, the Board had not indicated whether it intended to authorize such a plan, even assuming voting control was successfully acquired. Further, the Board is not comprised solely of Emmis's senior management such that their intention could be directly imputed to the Board. It is undisputed that the Board did not authorize the plan to amend until March 8, 2012, at which point they made a timely disclosure. It is telling that even when it authorized the plan, the Board did not authorize amendment of all the provisions Defendants had previously disclosed that they "may amend." Thus, Plaintiffs have fallen

34

short in their attempt to show that they have a likelihood of success in establishing that it was a misrepresentation for Defendants to have disclosed in the Schedule TO-I and Form 8-K filings submitted before March 2012 only that they "may elect" to make amendments to the Preferred Stock.

### b.      Deals with ESPN and Grupo Radio Centro

Plaintiffs also contend that Defendants' December 2011 and January 2012 Schedule TO-I filings violated Sections 13(e), 14(e), and 10(b), by falsely representing that:

> [W]e currently have no plans, proposals or negotiations that relate to or would result in ... any purchase, sale or transfer of an amount of our assets or any of our subsidiaries' assets which is material to us and our subsidiaries, taken as a whole; any material change in our present dividend rate or policy, our indebtedness or capitalization; ... [or] any material change in our corporate structure or business.

Exh. 609 at 8.  This statement was included in Defendants' December 1, 2011 Schedule TO-I filing and was not amended in any of Defendants' subsequent Schedule TO-I filings made on December 2, 12, and 14, 2011, and January 3 and 5, 2012.  Plaintiffs contend that, contrary to the representations made in this statement, Defendants were at the time negotiating with Grupo Radio Centro, S.A.B. de CV ("Radio Centro") and Disney/ESPN for significant deals worth $85 million and $96 million, respectively.  Although the Radio Centro deal did not close until April 12, 2012, and the Disney/ESPN deal was not finalized until April 26, 2012, well after Defendants' December 2011 and January 2012 SEC filings, Plaintiffs argue that because negotiations were occurring at the time these

35

filings were made, Defendants had an obligation to disclose them.

We view the evidence in a slightly different light.  The negotiations that resulted in the *sale* of an Emmis radio station to Disney/ESPN – that is, the negotiations that Plaintiffs contend should have been disclosed – did not even commence until "[l]ate February, early March" of 2012 (Enright Dep. at 33), well after the Schedule TO-I filing and amendments were filed and the tender offer had closed.  There is evidence that Emmis and Disney/ESPN did engage in prior negotiations, but those talks related to a possible *purchase* by Emmis of a different radio station, a deal that never materialized.  In arguing this theory, Plaintiffs appear to be conflating the negotiations relating to two separate transactions.  Plaintiffs do not contend – nor do we find – that the earlier negotiations required disclosure.

Turning to the negotiations with Radio Centro, the evidence shows that, in July and August 2011, Mr. Smulyan exchanged emails with Carlos Aguirre from Radio Centro addressing the possibility of accelerating a put/call agreement that had been negotiated in 2009 between Emmis and Radio Centro; additional emails followed in December 2011 in an attempt to schedule negotiations to discuss that possibility.[14]  However, our review of these emails as well as Mr. Smulyan's testimony convinces us that they represented nothing more than initial feelers by him sent in an effort to determine whether Mr.

---

[14] The evidence establishes that contacts between Emmis and Radio Centro between August and December were slowed in large part due to Aguirre's (Emmis's main contact with Radio Centro) having undergone heart surgery in September 2011.

Aguirre had any interest in engaging in such negotiations.  Clearly, the statements made were neither specific nor concrete nor sufficiently definitive and settled so as to make Defendants' December 1 tender offer and subsequent TO-I filings false or misleading.

Based on the evidence before us, it is clear that no negotiations between Emmis and Radio Centro occurred before January 18, 2012, when Messrs. Smulyan, Walsh, and Momtazee traveled to Mexico to meet with Carlos Aguirre and his brother and partner, Francisco Aguirre.  At that meeting, a price was agreed upon should Radio Centro decide to modify the 2009 put/call agreement; the company did eventually agree to that modification in April 2012, after further negotiations on the full array of matters relating to the deal.  Thus, as with the Disney/ESPN negotiations, it is clear, at least at this point, that initial negotiations with Radio Centro did not occur until well after the tender offer had closed.

For these reasons, we conclude that Plaintiffs have failed to show that they are likely to succeed in establishing that the statements contained in Defendant's December 2011 and January 2012 Schedule TO-I filing and amendments regarding the lack of any then-pending plans, proposals, or negotiations were false or misrepresentations.  Plaintiffs also are unlikely to be able to prove that any discussions that occurred between Emmis and Disney/ESPN or Radio Centro before the Schedule TO-I and amendments were filed were sufficiently advanced to have triggered a duty to disclose at the time those filings were made.

### 3.      Statement in January 30, 2012 Form 8-K Filing

We further conclude that Plaintiffs are unlikely to succeed on their claim that

Defendants made false and misleading statements in Emmis's January 30, 2012 Form 8-K

regarding the issuance of Preferred Stock to a "third party."  In that filing, Defendants

stated that Emmis intended to "issue shares of Preferred Stock to a third party or third

parties who may agree to vote their shares in accordance with the prior written

instructions of Emmis."  Emmis also disclosed that, if it issued 390,304 shares under such

third party voting arrangements, it would secure voting control over two-thirds of the

Preferred Stock.  Plaintiffs claim that these statements were a misrepresentation because

Emmis ultimately did not issue Preferred Stock to an *unrelated* third party, but instead

issued 400,000 shares of Preferred Stock to the Retention Plan Trust.

We regard this argument by Plaintiffs to be a nonstarter.  First, we note that the

Form 8-K filed by Defendants did not specify that the third party would be an "unrelated"

entity.  Even so, the evidence establishes that, prior to February 12, 2012, Emmis was

indeed negotiating with two unrelated third parties[15] about entering into such a deal, but

those negotiations ultimately fell through.  Thus, we find no evidence to support the

conclusion that, at the time the January 30, 2012 Form 8-K was filed, Defendants'

statement was false or misleading.  Nor have Plaintiffs succeeded in establishing that

---

[15] During both January and February 2012, Emmis attempted to consummate separate deals, first with Zell and then with Canyon, to acquire 400,000 shares of the Preferred Stock and agree to vote the shares as directed by Emmis.

Emmis had an obligation to file an amended Form 8-K, due at least in part to the fact that the filing itself included a disclaimer informing investors that: "Emmis does not undertake any obligation to publicly update or revise any forward-looking statements because of new information, future events or otherwise."   Exh. 611 at 3.

Moreover, it is clear that the information that was material to an investor in the market was not whether the Preferred Stock would go to a third party, but that the stock was expected to be issued to an entity who would vote as Emmis instructed, and that material information was fully disclosed in the January 30, 2012 Form 8-K.  For these reasons, we hold that Plaintiffs are unlikely to succeed in establishing that Defendants' statement regarding issuance of Preferred Stock to a third party was false or a misrepresentation.

### 4.      Schedule 13E – Going Private Transaction

Rule 13e-3 requires stock issuers who take steps to effect a "going private" transaction to disclose information relating to that transaction by filing a Schedule 13E-3 before the first purchase of securities or solicitation of a vote in furtherance of such transaction.  <u>See</u> 17 C.F.R. § 240.13e-3.  A "going private" transaction is a transaction or series of transactions involving the purchase of, tender for, or solicitation of proxies which has "either a reasonable likelihood or a purpose of producing, either directly or indirectly": (1) any class of the issuer's securities to become eligible for termination of registration; or (2) any class of the issuer's securities which is listed on a national securities exchange to be de-listed from the national securities exchange.  <u>Id.</u> § 240.13e-

3(a)(3)(ii).

Plaintiffs allege that Defendants violated Section 13(e) of the Securities Exchange Act by failing to file a Schedule 13E-3 "going-private" disclosure with the SEC before they began acquiring Preferred Stock.  Plaintiffs contend that Defendants' acquisition of Preferred Stock was part of a series of transactions designed eventually to take Emmis private, and thus, Emmis had a duty to disclose before embarking on those transactions. Although Plaintiffs contend that Mr. Smulyan intends to take the company private once the terms of the Preferred Stock are amended, Mr. Smulyan in the clearest of terms testified under oath, both in his deposition and in his hearing testimony, that he has no such intentions.  Tr. Vol. 1 at 196; Smulyan Dep. at 50-51.  Relying on this unequivocal declaration, we conclude that Plaintiffs have failed to establish that they are likely to be able to prove that Defendants acquired the Preferred Stock with the purpose of effecting a going-private transaction.  Such a conclusion at this point would have to be based on mere suspicion and speculation.

The only other evidence Plaintiffs put forth in support of this argument is their reference to Defendants' May 21, 2012 revised Preliminary Proxy Statement on the proposed amendments to the terms of the Preferred Stock, which states in relevant part that "following the effectiveness of the Proposed Amendments ... the likelihood of success of going private transactions will increase as there will be fewer requirements to be satisfied with respect to the Preferred Stock in connection with a going private transaction."  Ex. 616 at 17.  Clearly, the fact that, after passage of the amendments, the

40

likelihood of success of any subsequently attempted going private transaction would be increased does not necessarily show that the transactions Defendants engaged in to make the amendments possible were reasonably likely to produce or were intended to result in a going-private transaction.  We find no support in the evidence for the conclusion that Defendants' acquisition of Preferred Stock was intended to or likely to result in either eligibility for termination of registration or de-listing from a national securities exchange.

### 5.     Section 13(d) – Beneficial Owner

Section 13(d) and the rules and regulations promulgated thereunder require "[a]ny person" who is the "beneficial owner of more than 5 per centum" of a class of an equity security to, within ten days, either file a statement on a Schedule 13D or amend an existing Schedule 13D.  However, this requirement does not apply to "any acquisition of an equity security by the issuer of such security."  15 U.S.C. § 78m(d)(6)(C).

Here, Plaintiffs claim that Defendants Smulyan and Enright were required to file Schedule 13D disclosures in connection with the TRS transactions because they personally became "beneficial owners" of the TRS stock.  Defendants rejoin that neither Mr. Smulyan nor Mr. Enright was required to file a Schedule 13D because the TRS transactions on which Plaintiffs base their claim were between the various shareholders and Emmis, thereby making Emmis the beneficial owner, not Smulyan or Enright.  Thus, according to Defendants, because Emmis is the issuer of the stock, no Schedule 13D was required to be filed.

Rule 13d-3 provides in relevant part:

41

(a) For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

> (1) Voting power which includes the power to vote, or to direct the voting of, such security, and/or,

> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

(b) Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose [or] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.

17 C.F.R. § 240.13d-3.  At the adoption of Rule 13d-3, the SEC stated that the determination of beneficial ownership under the section requires:

> [a]n analysis of all relevant facts and circumstances in a particular situation is essential in order to identify each person possessing the requisite voting power or investment power.  For example, for purposes of the rule, the mere possession of the legal right to vote securities under applicable state or other law ... may not be determinative of who is a beneficial owner of such securities inasmuch as another person or persons may have the power, whether legal, economic, or otherwise to direct such voting.

Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release Nos. 33–5808, 34–13291, 42 Fed.Reg. 12,342, 12,344 (Mar. 3, 1977).

Courts have recognized that the definition of "beneficial owner" under § 13 is "quite broad," (e.g., Egghead.Com, Inc. v. Brookhaven Capital Management Co., 340 F.3d 79, 83 (2d Cir. 2003)), which is consistent with § 13's purpose of "alert[ing] the

42

marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 122-23 (2d Cir. 2001) (citation omitted).

In support of their contention that Messrs. Smulyan and Enright are beneficial owners under § 13, Plaintiffs cite the fact that the selling Preferred Stockholders in the TRS arrangements provided to Mr. Enright an irrevocable proxy and power-of-attorney to vote their Preferred Stock, and thus, that he has the ability to direct the vote. Plaintiffs also point to the deposition testimony of Mr. Smulyan, who, when asked who would determine whether Emmis's votes would be cast for or against the amendments, replied "I would be the ultimate decision maker, I would guess, I guess. I'm not sure." Smulyan Dep. at 97.

Based on such evidence, we are not persuaded that Plaintiffs are likely to be able to establish that either Mr. Enright or Mr. Smulyan had a duty to file Schedule 13D disclosures in connection with the TRS transactions. Although the Preferred Shareholders who participated in the TRS transactions provided Mr. Enright with an irrevocable proxy to vote their shares, he would be acting only in his official capacity as Secretary of Emmis, not in his individual capacity. Plaintiffs have failed to cite, nor are we aware of a case in which a director or officer of an issuer was deemed to be a beneficial owner of shares, when the shares were beneficially owned by the issuer and the director or officer acted solely in his official capacity. Instead, Plaintiffs cite cases with

43

facts that are not analogous to ours and address situations in which either the shares were not purchased by the corporation, and thus, the issuer exception was inapplicable, or, where the director or officer had personally acquired shares and acted in his individual as opposed to official capacity.  See Bender v. Jordan, 439 F. Supp. 2d 139, 162-63 (D.D.C. 2006) (deeming beneficial owners individual directors who acted in agreement with an outside investor who purchased shares in the corporation); Podesta v. Calumet Indus. Inc., No. 78-C-1005, 1978 WL 1088, at *7, 14-15 (N.D. Ill. May 9, 1978) (holding that incumbent officers and directors who were personally allocated shares and who formed a group to fend off a contest for control were beneficial owners and subject to Section 13D's disclosure requirements).

Nor are we persuaded that Plaintiffs are likely to be able to show that Mr. Smulyan would be or is a beneficial owner as that term is defined for purposes of Section 13D disclosures.  Although in his deposition, Mr. Smulyan testified that as trustee of the Retention Plan Trust, he "guess[ed]" he would be the "ultimate decisionmaker" when it came to directing the vote, both the voting agreements with respect to the TRS transactions as well as the trust agreement for the Retention Trust provide that the "trustee" (Smulyan) and the "employee shareholder" (Enright) "shall not take (or refrain from taking) any action with respect to the Subject Shares other than in accordance with the prior written instructions of the Company" and that they "shall take (or refrain from taking) any action with respect to the subject shares in accordance with the prior written instructions of the Company...."  Exh. 5 at EM0032905 (TRS Voting Agreement) and

44

Exh. 27 at B2 (Retention Plan Trust Agreement).  Given the clear terms of the documents

governing the voting of both the TRS and Retention Plan Trust in authorizing Mr.

Smulyan and Mr. Enright to act only upon the written instructions of Emmis, Plaintiffs

cannot establish that they have a likelihood of success in proving that either Mr. Smulyan

or Mr. Enright possesses the ability to influence or direct the vote in such a way that

requires Section 13D disclosures.[16]

## III.    Irreparable Harm/Inadequate Remedy at Law

Having found that Plaintiffs are unlikely to succeed on the legal merits of their

claim, we turn to the issue of whether Plaintiffs have nonetheless established that, if an

injunction does not issue, they are likely to suffer irreparable harm for which there is no

adequate remedy at law.  We conclude that they have failed to make such a showing.

Generally, "[a]n injury compensable in money is not 'irreparable,' so an injunction is

unavailable."  Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc.,

841 F.2d 163, 164-65 (7th Cir. 1988) (citation omitted).  In the instant case, we are not

persuaded that, without injunctive relief, Plaintiffs are at risk of suffering any significant

harm for which money damages would not be an adequate remedy.[17]

---

[16] Plaintiffs also argue that Messrs. Smulyan and Enright are beneficial owners because they used proxies or other contractual arrangements "as part of a plan or scheme to avoid the reporting requirements."  17 C.F.R. § 240.13d-3.  However, because Plaintiffs have failed to adequately develop this argument at this stage in the litigation, we address it no further in this order.

[17] It is true that courts have found that violations of the disclosure requirements can constitute irreparable harm, e.g., Bender v. Jordan, 439 F. Supp. 2d 139, 176-77 (D.D.C. 2006),

(continued...)

For example, in the first paragraph of their Amended Complaint, Plaintiffs allege that, once the proposed amendments become effective, their Preferred Stock will become "worthless."  Am. Compl. ¶ 1.  Our review of the evidence makes clear to us that, although there are certain aspects of harm at issue that are not purely monetary (e.g., the loss of entitlement to two directors on the Board following passage of the amendments), Plaintiffs' primary, underlying concern is the potential loss of value to their Preferred Stock they will suffer once the amendments become effective.  See Barrett Dep. at 101-02; DeFosset Dep. at 35-37; Fight Dep. at 90-91; Hirsch Dep. at 27-28.  That obviously is an economic loss for which Plaintiffs can be made whole with money damages, if they subsequently prevail on their claims.  See In re Guidant Corp. Shareholders Derivative Litig., No. 1:03-cv-955, 2006 WL 290524, at *15 (S.D. Ind. Feb. 6, 2006) ("[T]he claim that shareholders will be damaged by receiving less value in terms of the merger consideration by operation of these challenged provisions is essentially a claim for money damages and money damages almost always constitute an adequate remedy at law.").

Plaintiffs argue that, once the amendments become effective, it will be too difficult to complete an after-the-fact valuation of the Preferred Stock, and thus, money damages will be inadequate.  Although we concede that it is often quite a complicated undertaking to assess, it is not so difficult or uncommon for courts to engage in conducting such

---

[17](...continued)
but because Plaintiffs have failed to show a likelihood of success on the merits of any of their federal disclosure claims, they have failed to establish a risk of irreparable harm stemming from any lack of required disclosure.

valuations.  In addition, there is no indication that Defendants would be financially unable

to compensate Plaintiffs in money damages, if necessary, based on such a valuation.

Accordingly, we hold that any damage Plaintiffs are likely to suffer in the absence of

injunctive relief is not irreparable and can be adequately compensated for by an award of

monetary damages, should they ultimately prevail after a full assessment of the evidence

pursuant to controlling legal principles.

## IV.  Balance of Harms and the Public Interest

For the reasons detailed above, we have found that Plaintiffs have failed to meet

any of the threshold requirements for injunctive relief.  We therefore need not address the

balance of harms or public interest factors.  Nonetheless, we note that, had Plaintiffs met

the threshold requirements, the balance of harms is, if anything, a toss-up: Defendants

have shown a likelihood that, if an injunction were to issue and the vote be enjoined, both

Emmis's stock price as well as its efforts to refinance before the November 2012 deadline

could be seriously and adversely affected.  As for the public interest, it is served best in

our judgment by allowing the decisions made by this Indiana corporation to stand when,

given the circumstances presented here, they appear to have acted in compliance with

their statutory prerogatives.  At this preliminary stage of the litigation, Plaintiffs have

failed to show that Defendants' actions contravened either the IBCL or the relevant

federal securities disclosure laws.

## V.  Conclusion

For the foregoing reasons, we hereby <u>DENY</u> Plaintiffs' request for injunctive

47

relief.

IT IS SO ORDERED.

Date: _____08/31/2012_____


_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

David C. Campbell
BINGHAM GREENEBAUM DOLL LLP
dcampbell@bgdlegal.com

Abram B. Gregory
TAFT STETTINIUS & HOLLISTER LLP
agregory@taftlaw.com

Edward Wesley Harris III
TAFT STETTINIUS & HOLLISTER LLP
eharris@taftlaw.com

Richard A. Kempf
TAFT STETTINIUS & HOLLISTER LLP
rkempf@taftlaw.com

Daniel J. Leffell
Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019

Michael R. Limrick
BINGHAM GREENEBAUM DOLL LLP
mlimrick@bgdlegal.com

Adam  Offenhartz
GIBSON DUNN & CRUTCHER, LLP
aoffenhartz@gibsondunn.com

Gordon L. Pittenger
TAFT STETTINIUS & HOLLISTER LLP
gpittenger@taftlaw.com

Steven C. Shockley
TAFT STETTINIUS & HOLLISTER LLP
sshockley@taftlaw.com

James A. Strain
TAFT STETTINIUS & HOLLISTER LLP
strain@taftlaw.com

Wayne C. Turner
BINGHAM GREENEBAUM DOLL LLP
wturner@bgdlegal.com

Aric H. Wu
GIBSON DUNN & CRUTCHER LLP
awu@gibsondunn.com

Patrick Austin Ziepolt
BINGHAM GREENEBAUM DOLL LLP
pziepolt@bgdlegal.com