# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

July 24, 2015

To:
Laura A. Briggs
UNITED STATES DISTRICT COURT
Southern District of Indiana
United States Courthouse
Indianapolis , IN 46204-0000

| No. 14-1647 | CORRE OPPORTUNITIES FUND, LP, et al.,<br> Plaintiffs - Appellants<br><br>v.<br><br>EMMIS COMMUNICATIONS CORPORATION,<br>Defendant - Appellee |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:12-cv-00491-SEB-TAB<br>Southern District of Indiana, Indianapolis Division<br>District Judge Sarah Evans Barker ||

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:         No record to be returned

NOTE TO COUNSEL:

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**

7/24/2015

**Received by:**

*Maggie Gilstrap*

Deputy Clerk, U.S. District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

July 2, 2015

Before:
    JOEL M. FLAUM, Circuit Judge

    FRANK H. EASTERBROOK, Circuit Judge

    MICHAEL S. KANNE, Circuit Judge

CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

| No. 14-1647 | CORRE OPPORTUNITIES FUND, LP, et al., <br> Plaintiffs - Appellants <br><br> v. <br><br> EMMIS COMMUNICATIONS CORPORATION, <br> Defendant - Appellee |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:12-cv-00491-SEB-TAB <br> Southern District of Indiana, Indianapolis Division <br> District Judge Sarah Evans Barker ||

    The judgment of the District Court is AFFIRMED, with costs, in accordance with the decision of this court entered on this date.

Case 1:12-cv-00491-SEB-TAB   Document 182   Filed 07/24/15   Page 4 of 13 PageID #: 14303
Case: 14-1647   Document: 00712574472   Filed: 07/24/2015   Pages: 10 (4 of 13)

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 14-1647

CORRE OPPORTUNITIES FUND, LP, *et al.*,

              *Plaintiffs-Appellants*,

*v.*

EMMIS COMMUNICATIONS CORPORATION,

              *Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-491-SEB-TAB — **Sarah Evans Barker**, *Judge*.

_____

ARGUED DECEMBER 5, 2014 — DECIDED JULY 2, 2015

_____

Before FLAUM, EASTERBROOK, and KANNE, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Plaintiffs, who own preferred stock in Emmis Communications Corp., contend that Emmis violated Indiana law by voting some shares. The suit is in federal court because, at its outset, it included a non-frivolous claim under federal securities law. The district court analyzed the federal claim at length before ruling against the Owners (as we call the plaintiffs). 892 F. Supp. 2d

1076 (S.D. Ind. 2012). The Owners now rely entirely on Indiana corporate law. To keep this opinion manageable, we pare away all but the most vital facts; the rest are in the district court's exhaustive opinions. (The district court's 2014 opinion on the state-law issues is not published but is available from the court.)

In 1999 Emmis issued 2.875 million shares of preferred stock for $50 a share, raising about $144 million. The shares promised cumulative dividends of $3.125 a year. A dividend is "cumulative" when any unpaid portion carries over to the next year. If any dividends on the preferred stock remain unpaid, Emmis cannot repurchase any of its common stock, or pay dividends on it, and the preferred stockholders can elect two members of its board of directors. To change any of the preferred stock's rights, Emmis needs the consent of two-thirds of the outstanding preferred shares.

In October 2008 Emmis stopped paying dividends on the preferred stock. It blames the financial crunch, but the reason is irrelevant. It has not paid anything on the preferred shares since then, so the cumulative dividends piled up and prevented the firm from paying dividends on common stock or issuing any senior securities, which has made it hard for Emmis to raise new capital. In 2010 Emmis asked the owners of the preferred stock to accept a going-private transaction in which their stock would be exchanged for subordinated debt rather than cash; this proposal failed to get a 2/3 vote, which was required because going private entails retiring the common stock, a step inconsistent with the preferred shareholders' rights unless they were first paid $50 a share plus all cumulative dividends.

By 2011 the preferred shares were trading in the market at about 25¢ on the dollar, and owners were disaffected. Some asked Emmis to repurchase the preferred stock, but that was not attractive because even one outstanding share would leave Emmis saddled with all of the preferred stock's burdens. Of course, if the number of outstanding shares were small enough, Emmis could afford to buy this residue at par plus all accumulated dividends; but if owners thought that Emmis would do that, then they would not sell to Emmis at a deep discount (everyone would want to be the owner whose shares were purchased on the back end, at maximum price), and all the shares would remain outstanding.

Emmis's management began to search for ways to change the terms of the preferred stock. That, too, required a 2/3 vote, but many owners were willing to sell at a discount, and to promise favorable votes as part of the transaction, as long as Emmis could ensure that holdouts would not get better terms. It ultimately chose two ways to get enough votes.

First, Emmis signed holders of approximately 60% of the preferred shares to what the parties call "total return swaps." Emmis promised to purchase each preferred share for about $15; Emmis paid, and the owners delivered their shares to an escrow. Closing was deferred for five years (though it could be accelerated at Emmis's option, or if the shares were delisted and stopped trading). The selling owners agreed to vote their shares as Emmis instructed during the interim. Emmis adopted this device because, once it purchased any given share outright, it would have been retired and lost voting rights. Ind. Code §23-1-25-3(a). As long as a share is "outstanding," however, it has a vote. Ind. Code §23-1-30-2(a). And in Indiana, apparently alone among the states,

a corporation can vote its own shares. Ind. Code §23-1-22-2(6). That's why Emmis set out to acquire voting rights while leaving the shares "outstanding."

Second, Emmis repurchased some of the preferred stock in a tender offer and reissued it to a trust for the benefit of employees. The trust was established to pay bonuses to workers who stuck with the firm through the financial downturn. The trustee had instructions to vote this stock at management's direction. Senior managers and members of the firm's board were excluded, which left them free to propose and vote on the deal without a conflict of interest.

The two devices together allowed Emmis to control more than 2/3 of the votes. (Plaintiffs own most of the remaining preferred shares.) Emmis then called on owners of both common and preferred stock to vote on whether the terms of the preferred stock should be changed. Both groups approved by the required margin. The cumulative feature of the preferred stock's dividends was eliminated; the other rights we mentioned earlier also were abrogated. This would not have been possible if the documents creating the preferred stock had made a change in its terms a compensable event; then all a 2/3 vote could have done would have been to replace the favorable terms with a cash payment (equal, say, to $50 a share plus accrued dividends). But that safeguard was not there, which is what made this transaction economically attractive to Emmis (which is to say, investors other than the preferred shareholders). Once the vote had been completed, the escrow agent closed the swap transaction, and Emmis retired the preferred shares it received.

As this litigation has proceeded, most of the Owners' arguments have fallen away. We've mentioned the securities-

law arguments. The Owners also contended, for example, that Emmis violated its fiduciary duty by reducing the rights of one set of investors in order to increase the wealth of another set. But the district court rejected all of the Owners' state-law arguments.

On appeal the Owners pursue only two arguments. They maintain that the shares in the swap transactions were no longer "outstanding" for the purpose of §23-1-30-2(a) and so lost their votes. And they contend that the trust should be ignored because the shares were not held in a fiduciary capacity. We start with the latter argument.

Indiana allows corporations to vote their own shares "except as otherwise prohibited by this article." Ind. Code §23-1-22-2(6). One statutory exception is §23-1-30-2(b), which provides that a corporation is not entitled to vote its shares if they are owned by a second corporation, and the issuing corporation owns a majority of the stock of that second corporation. This limits holding-company structures and might be thought to rule out some trust structures too, including ESOPs (employee stock ownership plans). Subsection 2(c) then provides an exception to the exception: "Subsection (b) does not limit the power of a corporation to vote any shares, including its own shares, held by it in or for an employee benefit plan or in any other fiduciary capacity." That's the rule on which Emmis relied to vote the shares in the trust, and the district judge concluded that this was proper.

Plaintiffs do not deny that the structure satisfied the requirements of trust law and that the beneficiaries of the trust were employees. Instead they contend that the trust should be disregarded because the design was to vote the preferred stock in a way that decreased its value, and then exchange

6                                                                No. 14-1647

preferred for common stock. The Owners depict this as a value-reducing transaction. But what has that to do with the question whether the shares were held by "an employee benefit plan"? It might have been a ground for complaint by the employees under Indiana's law of trusts, but the Owners are not among the trust's beneficiaries and do not invoke trust law. Once we conclude, as we have done, that this was an "employee benefit plan," the corporate-law question has been answered: Emmis (through the trustee) was entitled to vote the shares.

The Owners' objection to the votes cast by holders of the shares subject to the swaps is that even though Indiana allows corporations to vote their own shares, they may vote only "outstanding" shares (Ind. Code §23-1-30-2(a)), and these shares, the Owners insist, were not "outstanding." Yet they were owned by persons other than Emmis. Having put up a lot of money, Emmis understandably wanted the vote, which would affect the value of the shares. (Every state's law permits an owner to transfer a vote in connection with an economic interest in the shares, such as a pledge to secure a loan.) If shares ceased to be "outstanding" as soon as their owners delivered them to an escrow, however, they would have retained that retired status even if the exchange was never completed. Nothing we could find in Indiana law contemplates the possibility of shares drifting in and out of "outstanding" status as the probability or timing of a completed sale fluctuates.

The Owners observe that Emmis structured this transaction so that it would bear the economic risk of the shares, while the original owners no longer faced variability in the shares' market price. That's true. So if this transaction had

been conducted in any state but Indiana, a court probably would have said that Emmis could not vote these shares, because it was their beneficial owner even if not their legal owner. But Indiana allows corporations to deal in and vote their own shares. Indiana gives voting rights to record owners, see Ind. Code §23-1-20-24, and the parties involved in the swaps were the record owners, who under Indiana law could agree to vote as Emmis directed. Ind. Code §23-1-31-2. All that's necessary is that the shares be outstanding—as these shares were until the transaction closed and Emmis received the shares. Indiana law is distinctive, but it is not our job to reduce inter-state variance in corporate law.

The reader will note that we have not cited a single decision by an Indiana court. That's because none interprets the statutes we have discussed. The parties have cited a few opinions by Indiana's judiciary, but they do not address these statutes and seem to us to have little bearing on the transactions Emmis designed. Left to our own devices, we would have thought that these novel state-law questions belong in state court. (The parties are not of completely diverse citizenship.) But the Owners filed their suit in federal court under the federal-question jurisdiction and did not ask the district judge to send the state issues to state court. The state-law issues were vigorously litigated, and because neither side asked the district judge to relinquish supplemental jurisdiction, 28 U.S.C. §1367(c)(1), (3), we conclude that she did not abuse her discretion in resolving all aspects of the parties' dispute.

The undercurrent of the Owners' briefs is that the judiciary should not let the common stockholders (who elect the board) get away with improving their own position at the

expense of the preferred stockholders. As we've mentioned, the agreements establishing the preferred stock might have required compensation if the terms changed, but they did not do so. And perhaps there were reasons to omit such clauses. Throughout the history of corporate law, several kinds of doctrines have made it hard for firms to issue new stock, or pay dividends on common stock, while previously issued stock (preferred or common) was in arrears. Those requirements slowly disappeared from state law because they made it hard for firms to recapitalize without going through bankruptcy. See Bayless Manning & James J. Hanks, Jr., *Legal Capital* 36–47, 67–95 (2013). For Emmis, which wanted to recapitalize by going private, the alternative to changing the preferred stock's terms might have been reorganization under Chapter 11, which would have allowed the value of that stock to be written down. Maybe that's why owners of more than 2/3 of the preferred stock freely sold to (or agreed to swaps with) Emmis; they voted with their wallets that the terms they were getting were better than the likely outcome of standing pat on the shares' original contractual rights.

But if this is wrong, still it would not be a good reason to undermine Indiana's decision, codified in Ind. Code §23-1-22-2(6), that corporations may deal in and vote their own shares. If as the Owners maintain this was a deliberately value-reducing *use* of that statutory power, then the right defendants would have been the members of Emmis's board, and the right theory would have been that the directors violated their duty of loyalty by using their positions to transfer wealth from one class of investors to another. Yet the Owners did not sue the directors; their only fiduciary-duty claim was against the corporation itself, and the district court held that

in Indiana corporations (unlike directors) do not have fiduciary duties to investors. All that remains are arguments about the extent of statutory power rather than about the propriety of its use, and we've explained why Emmis had the authority to act as it did.

An *amicus* brief filed by the Council of Institutional Investors asks us to reverse because, in the Council's view, Emmis did not employ "corporate governance best practices." The Council apparently scorns state law and would prefer a synthetic federal corporate common law, or perhaps a requirement that every state use the same principles as Delaware. If judges (and state legislators) could be sufficiently sure what the best practices are, that would be an attractive idea. But it is hard to know the full effects of corporate codes, which lead to contractual adjustments and changes in prices. Federalism permits states to adopt different codes, after which people can choose which states' firms to invest in, and at what price. See Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976); Ralph K. Winter, *State Law, Shareholder Protection, and the Theory of the Corporation*, 6 J. Legal Stud. 251 (1977); Eugene F. Fama, *Agency Problems and the Theory of the Firm*, 88 J. Pol. Econ. 288 (1980).

Confident assertions along the lines of "state X's rule Y is bad for investors, so Y should be stamped out" have run through corporate law and commentary since Governor Woodrow Wilson persuaded New Jersey's legislature to replace investors' contractual arrangements with mandatory prescriptions, and businesses responded not by using New Jersey's rules but by reincorporating in the more permissive Delaware. Doubtless many corporate rules *are* bad for inves-

10 No. 14-1647

tors, but the way to find them is by competition and price adjustments, not judicial attempts to suppress federalism. The process of competition has yielded substantial benefits. See Roberta Romano, *The Genius of American Corporate Law* (1993). Indiana's willingness to allow corporations to vote their own shares may be good, or it may be bad, but the ability to negotiate for better terms, or invest elsewhere, rather than judicially imposed "best practices," is how corporate law protects investors.

AFFIRMED